**PLAX CORP. v. ELMER E. MILLS CORP.**

No. 10695.

United States Court of Appeals
Seventh Circuit.

April 20, 1953.

Rehearing Denied June 8, 1953.

John A. Dienner, Edward C. Grelle, Carl S. Lloyd, Chicago, Ill., for appellant.

Charles L. Byron, Howard W. Clement, Chicago, Ill., Alfred C. Aurich, Philadelphia, Pa. (Synnestvedt & Lechner, Philadelphia, Pa., of counsel), for appellee.

Before DUFFY, LINDLEY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

In a suit for the infringement of certain patents owned by the plaintiff, the Plax Corporation, the District Court found that Claims 8, 19, 20, 21, 23 and 26 of Ferngren Patent No. 2,128,239, Claim 11 of Ferngren Patent No. 2,175,053, and Claim 6 of Kopitke Patent No. 2,349,177 were valid and infringed. The court entered judgment enjoining the defendant, the Elmer E. Mills Corporation, from further infringement and ordering an accounting for damages suffered by the plaintiff. From this judgment the defendant appeals.

All the claims in issue relate to processes for forming hollow articles, such as bottles and other types of containers, from material in a plastic state. In general, the patented processes consist of preshaping the plasticized material into tubular form by extrusion of the material through a die having an annular orifice; delivering the tube of plasticized material into a mold having a cavity which defines the shape of the completed article; expanding the tube to meet the confines of the mold cavity by blowing; and cooling or rigidifying the material so expanded, after which the article is removed from the mold.

In each of the patented processes the leading end of the tubular body is closed, either before it is delivered into the mold or upon contact with the bottom of the mold cavity. The compressed air or other distending medium is introduced directly into the tubular body of plasticized material through a blow pipe located within the extrusion tube. The combined extrusion and blowing mechanism is operative at a given time with respect to but a single mold and is monopolized by that mold for the period of time required to form the article within. A more detailed description of the patented processes is contained in the specifications, to which we shall refer later.

The accused process, in general, likewise consists of injecting compressed air into an extruded tube of plasticized material and distending the material to the confines of a mold cavity. More specifically, in carrying out this process a series of molds is arranged along the periphery of a continuously rotating, circular table. Each mold has a bottle forming cavity and is separable to provide upper and lower mold halves. The molds are opened consecutively to receive segments of the plastic tubing which is delivered continuously and at a constant rate from a conventional extruder with an annular die. Air at low pressure is admitted to the interior of the tubing in the region of discharge from the die so as to prevent the extruded tube from collapsing. The molds are positioned so that as they travel in their circular path the center line of each successive mold cavity becomes substantially parallel to the plastic tubing emanating from the extruder, whereby the plastic tubing is positioned between the open mold halves. The continu-

ously traveling molds are placed so that the neck portion of the bottle-forming cavities lead, and the velocity of the molds is adjusted to be slightly greater than the rate at which the tubing is discharged from the extruder to effect a slight stretching of the tubular material. Guide posts are provided to align the plastic tubing along the center line of each of the mold cavities.

At opposite ends of the cavity in each mold half there are narrow lands. The plastic tubing settles upon the narrow lands of the lower mold half as the mold cavities successively reach the position of parallelism with the extruded tubing. Immediately thereafter the upper mold half is urged downwardly and closes tightly against the lower half. As the mold closes the lands at the ends of both the upper and lower halves pinch the tubing firmly together at both ends of the mold simultaneously. The segment of the tubing upon which the mold has closed is thus sealed off, and becomes a sealed fluid-tight chamber isolated from every other section and from the rest of the member of tubular material extending between the last mold to be closed and the parent mass of the plasticized material.

As the mold closes, the lower end of a hollow blowing needle, located within the leading end of the upper mold half, pierces that end of the plastic tubing as it is sealed within the mold. Compressed air is then forced through the needle into the sealed tubing, expanding it against the adjacent surfaces of the mold cavity to form a bottle blank. A cooling medium circulated through chambers in the mold rigidifies the material, after which the mold opens and the hollow molded article is removed by the operator who manually grasps that bottle blank and tears it off the string of bottle blanks.

On the question of infringement the District Court found both that the specified claims of the patents in suit described the defendant's process and that the accused process came within the principle of these claims. We have concluded that in this the District Court was clearly in error.

The Ferngren Patent No. 2,128,239, hereinafter sometimes referred to as "Ferngren-239," reveals that in the practice of the patented process an extrusion tube is used which consists of two concentric tubes, the inner tube furnishing a conduit for the blowing air while the annular orifice between the two tubes serves as a conduit for the plasticized material. This extrusion tube is inserted into a mold cavity so that the end of the tube is relatively close to the bottom of the mold. At the same time plasticized material is forced through and out of the combination blow pipe and extrusion tube and is thus caused to assume the form of a tubular plastic body. The open, forward end of the extruding plastic tube either will have been confluently closed by aid of suction within the blow pipe or other means before the extrusion tube is positioned relatively close to the bottom of the mold, or it is closed after the extrusion tube is so positioned upon contact between the plastic tubing and the bottom of the mold. As the plastic tubing is then extruded, a portion of the material is deposited upon the bottom of the mold cavity and caused to spread, thus forming a bottom wall for the hollow article subsequently to be formed.

The combination blow pipe and extrusion tube is then progressively elevated with respect to the bottom of the mold cavity. Concurrently with this withdrawal away from the bottom of the mold plastic tubing is extruded and the compressed air or other distending medium is introduced into the tubing from the blow pipe. The effect of this synchronized extrusion and distending operation is to form a gradually extruding plastic bag or hollow blank which swells laterally as it is being extruded. As the emitting point of the progressively extruding tubular body traverses the entire mold cavity, the simultaneous distending influence forces the expanding hollow blank into conformity with the confines of the mold cavity. The combination blow pipe and extrusion tube is progressively elevated and the plastic tube is progressively extruded at a rate and in a quantity proper to insure the desired thickness or strength of the container wall at all levels within the mold.

After the end of the combination blow pipe and extrusion tube has thus traversed

the entire mold cavity, extrusion ceases and the hollow article thus formed is severed from the parent body of plastic material remaining in the extrusion tube. The article is then rigidified by a cooling medium and removed from the mold.

The specifications and drawings of Ferngren Patent No. 2,175,053, hereinafter sometimes referred to as "Ferngren-053," disclose that in the practice of that process here pertinent, plasticized material is forced under pressure into a combination blow pipe and extrusion nozzle, thereby forming the material into a tube within the nozzle. A sleeve surrounding the lower portion of the nozzle and serving as the closing valve at its orifice confines this tubular body within the nozzle. A cup mold to be used in closing the end of the plastic tube is then brought into position beneath the nozzle. An air tight contact is made between the peripheral portion of the cup mold and the lower portion of the sleeve, thereby lifting the sleeve and opening the nozzle orifice. Pressure applied within the extruder forces the plasticized material into the space between the lower end of the nozzle and the inner surface of the cup mold. This forms a closure over the end of the tube, which closure comprises the bottom or end wall for a tubular wall formation subsequently to be extruded and formed into a hollow article.

The end closing mold is removed and an article mold is brought into position beneath and into contact with the nozzle. The plasticized material in the form of a closed-ended tubular body is then extruded into the article mold. Simultaneously low pressure air is introduced into the tube through an air valve in the nozzle to prevent its collapse. Extrusion of the tubular body continues until the closed end reaches the bottom of the article mold. The sleeve surrounding the lower portion of the nozzle then closes the orifice to cut off extrusion and the closed-ended tubular plastic body is sealed within the article mold. High pressure air is then introduced through the valve in the nozzle and the plastic tube is expanded into conformity with the confines of the mold. After the article is rigidified by a cooling medium circulating in the mold the article is removed from the mold.

The specifications and drawings reveal that in the practice of the process covered by Kopitke Patent No. 2,349,177, plasticized material is forced into an annular space between the outer and inner walls of a combination blow pipe and extrusion nozzle, thus forming a plastic tube within the nozzle. A cut-off knife positioned over the end of the nozzle functions in cooperation with the nozzle to close the end of the plastic tube confined within. The knife is removed and the nozzle is brought into register with the upper end of an open mold. The closed-end plastic tube is extruded downwardly, and air introduced into its interior through the blow pipe causes the closed-end tube, as it is suspended from the orifice of the nozzle, to develop into the shape of a bubble. Extrusion continues and the suspended plastic bubble is further developed and elongated until its closed end is extended slightly beyond the bottom of the open mold cavity. The mold then closes about the elongated bubble. As the mold sections come together the lower portion of the bubble is pinched so that a weld is formed between its walls. The upper portion likewise is pinched but only partially closed, with a sufficient opening left to admit the blowing air. Blowing air is then introduced and the plastic bubble expanded to meet the confines of the mold. The article may be left in the mold until it is sufficiently rigidified to hold its shape.

In the two Ferngren patents and the Kopitke patent, which were all found to be infringed, we find the following common and distinctive characteristics:

(1) The process is a synchronized method of extrusion and blowing, the rate of extrusion and blowing being varied and regulated as to each other.

(2) The process involves the closing of only the leading end of the extruding tube of plastic before blowing the article to the shape of the mold.

(3) The article is blown with compressed air supplied through the blow pipe portion of the extruder nozzle.

(4) The article is fully blown to the contour of the mold before the portion of the plastic blown is separated from the mass of plastic from which it was extruded.

(5) The entire process is completed as to one mold before it is started in another.

We find none of these characteristics in the defendant's process. There the rate of extrusion is uniform at a speed slightly less than the speed of the movement of the molds. In the accused process the end of the extruding tube of plastic is not closed until a mold closes on a segment of the tube, thereby simultaneously pressing together both ends of the segment and isolating that segment from the possibility of its being blown with air coming through the blow tube of the extrusion nozzle. The pinching of the segment between the two halves of the mold also, for all practical purposes, isolates that segment of plastic from the parent body of plastic.

In the defendant's process the blowing of the bottle or other container occurs only after the segment of the plastic tube has been isolated within the mold by the closing of the mold. This closing movement also causes the hypodermic-needle type of valve in the front of the mold to pierce the leading end of the segment, thereby furnishing the aperture and valve through which compressed air is introduced to expand the segment of the tube to the shape of the mold. The defendant's process is a continuous process in which the different steps are taking place in the various molds at the same time.

By his testimony and by his illustrated charts the plaintiff's expert witness, Richardson, attempted to show that the patented processes shown by the various claims of Ferngren Patents Nos. 2,128,239 and 2,175,053 and of the Kopitke patent and the steps of the accused process were substantially the same. In the chart on Claim 8 of Ferngren-239, Richardson says that the step in the patented process described in Claim 8 of Ferngren-239 of "bringing the end of the tube of plastic material into contact with the bottom of the mold to close the end of the tube" is found in the defendant's process when the mold closes on a segment of the tube and thereby pinches together both ends. But in the charts on Claims 19, 20, 21 and 23 of the same patent, on Claim 11 of Ferngren-053 and on Claim 6 of the Kopitke patent, he finds the step of the one end of the tube being closed at the rear end of each mold by the closing of each mold on a segment of the tube.

The wording of the claims of the patents in suit variously describe the step of closing the end of the plastic tube as follows: "bringing the end of the tube * * * into contact with the bottom of the mold to close the end of the tube"; "closing the leading end of the extruded plastic tube"; "closing the leading end of the tubular body"; "preforming a portion of said mass * * * into a closed-ended hollow body"; "preshaping a portion of a mass into a closed hollow body"; "closing the outer end of said tubular body"; and "forming said material into an end-closed tube."

It seems clear to us that the wording of none of these claims describes any step in the accused process. It seems equally clear that there is no equivalent in the accused process for the closing of the leading end of the tube as described in the patents in suit. This step in all of the patents in suit was necessary where the segment of the tube being blown remained an integral part of the parent mass while being blown with air coming through a blow pipe in the center of the extrusion nozzle. In the patents in suit the closed end of the tube, either in whole or in part, became a part of the article being blown. On the other hand, in the accused process both ends of the segment of tube were closed simultaneously. The segment was thereby separated from the parent mass; the segment was then blown by air coming through the needle valve in the leading end of the mold and the "closed end" of the tube in the accused process which, according to Richardson, the expert, corresponded to the "closed end" in Claims 19, 20, 21 and 23 of Ferngren-293, Claim 11 of Ferngren-053 and Claim 6 of the Kopitke patent, was a part of the material pinched off outside of the mold, a part which never entered the mold, which had nothing to do with the

blowing of the article and never became a part of the blown article.

The other differences between the patented processes and the accused process are just as fundamental as the difference in the step of "closing the end of the tube" but it would unduly extend this opinion to describe all such differences in detail.

In Claim 11 of Ferngren-053, one step of the process was described as "subjecting the material in a comminuted form to both heat and pressure to convert it to a plastic and moldable condition." In the specifications of Ferngren Patent No. 2,230,188 the patentee admitted that bringing the organic plastic material to a plastic and moldable condition by the simultaneous application of heat and pressure was old and well known; that the means for doing this was no part of the invention but was "illustrated substantially by the patent to Gordon, No. 1,935,050." The Gordon patent for such a plasticating machine was issued in November 1933, almost three years before the application for Ferngren-053 was filed, so we may assume that this step in Claim 11 of that patent was also illustrated by the Gordon patent. The plaintiff's expert witness Richardson admitted that at the time of the invention of the process disclosed by Ferngren-053, there were many such machines available for plasticating comminuted organic plastic material. This step in the Ferngren-053 process used heat and pressure, the same old method, on the powdered, organic plastic material to convert it to a plastic and moldable condition, the same function or result that had been known for years. As said in Lincoln Engineering Co. v. Stewart Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008:

> "The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention."

One should not be permitted, by the simple expedient of including an old step or element in a patent where it serves only the old purpose or performs only the old function, to draw that old step or element into the field of the monopoly of the patent and thereby deny to the public the right to use that step. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162. This step of the patented process was, therefore, equally available to the use of the defendant and its use by the defendant could not be considered as infringement of the plaintiff's patent.

Most of the claims of the patents in suit describe, as one step of the process disclosed by the claim, the extrusion or forming of the plastic material into a tubular shape by extruding the material from an annular orifice. The plaintiff's expert witness Richardson described the extruder which was shown on the chart explaining Ferngren-293 as follows:

> "That is a type of extruder, a screw type extruder, which has been manufactured by a number of manufacturers in this country for several years and is the outgrowth of the rubber extruder or *tuber* which has been known for a long time in that industry." (Our emphasis.)

The Armstrong Process Patent No. 8,180, issued June 24, 1851, had disclosed the making of gutta-percha, or gutta-percha compounded with other substances, into a pipe or tube in the manner of making lead pipe. Since this step was also old—was disclosed by a very old patent—it was also equally available for use by the plaintiff and the defendant.

The plaintiff in this action is seriously contending that the defendant by using its process, which admittedly is only one process, is infringing all three of the patents in suit. The plaintiff's expert Richardson said that, while the means used in the various steps of the defendant's process were different from the means described in the various claims in the patents in suit, the steps used by the defendant added up to substantially the same process as disclosed in each of the patents in suit. If these various patents in suit are valid, each must necessarily disclose a substantially different process. If the patents are

valid and do disclose substantially different processes, it is difficult for us to understand how the one process used by the defendant could possibly be substantially the same as each of the processes disclosed by the patents in suit.

It is true, of course, that this court is not permitted to set aside a finding of the trial court unless we can say that the finding is clearly erroneous. But in the instant case, as in Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 36, 50 S.Ct. 9, 74 L.Ed. 147, the solution of the question of infringement depends upon comparison between the processes disclosed by the patents in suit and the process of the defendant as disclosed by the stipulation of the parties which described the defendant's process both by written description and by illustration. After a comparison of this documentary evidence, which was before the District Court and is now before this court, we need only to correctly apply thereto the rule of equivalency to determine whether the finding of infringement by the District Court was correct. This court has the right to interpret documentary evidence for itself. Lewyt Corp. v. Health-Mor, Inc., 7 Cir., 181 F.2d 855, 857; Charles Peckat Mfg. Co. v. Jacobs, 7 Cir., 178 F.2d 794, 802.

It is true that in this case the finding of infringement by the District Court was supported by the testimony of the plaintiff's expert witness Richardson to the effect that, while the means described in some of the steps of the patents in suit were different from the means which were used in the various steps of the defendant's process, they were the equivalents of the steps in the defendant's process, and that, considering all of the steps together, the defendant's process is substantially the same as the various processes described in the plaintiff's patents. Where, as here, the documentary evidence before us clearly contradicts such conclusions of a witness, even though that witness be an expert, it is our duty to set aside a finding based on such testimony.

Our examination and study of the documentary evidence, of the wording of the claims and the specifications and illustrations of the patents in suit, and of the descriptions and illustrations of the accused process which were stipulated by the parties as being correct, convinces us that the accused process neither falls within the wording, nor comes within the principle, of any of the claims of the patents which the trial court found to be infringed.

Having decided that none of the claims of the patents in suit was infringed, we pass next to the question of the validity of these patents. The District Court held valid the patents in suit as to all of the claims we have discussed above. The appellant insists that the District Court erred in failing to hold that the patents in suit were invalid as to all of these claims.

The trial court, after an extended discussion and comparison of the patents in suit and of prior patents which the defendant insists anticipated the patents in suit, made the following Findings of Fact on the question of validity.

### X.

Only four of the numerous prior art patents introduced by the defendant were discussed by the defendant's expert witness. The four patents discussed were Armstrong No. 8,180, issued in 1851; Soubier No. 1,981,636, issued in 1934; Howard No. 1,592,299, issued in 1936, and Heist No. 1,654,647, issued in 1928. The defendant's expert witness said that the Howard Patent No. 1,592,299 was the defendant's best reference and came closest to disclosing the process described and claimed in all of the patents in suit. However, the Howard patent was not pleaded in either defendant's answer or its amended answer.

### XI.

The owners of the Howard patent in the years 1929, 1930 and 1931 had spent $70,000 in an unsuccessful attempt to produce a commercially acceptable product by the method disclosed in the Howard patent.

### XII.

Of the four above described patents which were discussed by the defendant's expert, three were references which had been cited in the Patent Office and which

the Patent Office decided did not anticipate the claims in suit. The Howard and Armstrong patents were cited by the Patent Office against Ferngren Patent No. 2,128,-239, and the Soubier patent was cited against Kopitke Patent No. 2,349,177.

## XIII.

The apparatus disclosed in the Soubier patent is not a practical apparatus for making hollow glass articles.

## XIV.

Using the practice of gob blowing as disclosed by the Howard patent for blowing glass, a commercial article could not be made from organic plastic material for the reasons that (1) plastic material does not flow as a liquid as glass does; (2) plastic material requires a certain amount of initial force to cause it to begin to move; and (3) hot plastic material in a state of workable plasticity has a rather rubbery characteristic in that, under relatively low stresses, it behaves like an elastic solid instead of a liquid, which means that, if one were to endeavor to form a gob of plastic material and to blow on it, no blowing would take place at all as pressure is raised somewhat above the atmospheric pressure; and then, when the stress on the wall of the closed gob reaches and passes the yield point, the plastic begins to flow, but flows only at the point where the stress has passed the yield point, probably on the side of the gob, where there would be a blow out.

## XV.

It is impractical, if not impossible, to blow organic plastic material by the method used in the glass industry, and the making of containers of glass and the making of containers of organic plastic materials are, therefore, not in the same art.

## XVII.

Neither the Heist, Armstrong, Soubier nor the Howard patents anticipates or renders invalid the four patents in suit.

## XVIII.

At the time of the making of the inventions set forth in the patents in suit it required invention to produce the processes set forth in the claims of the patents in suit.

## XIX.

Though it was tried, no one was able to produce hollow containers from organic plastic material prior to the invention of the patents in suit, and the processes used in the glass and other arts did not make a satisfactory product when used in the plastic field.

## XX.

The claims of the patents in suit and their specifications are sufficiently definite to disclose the processes of the plaintiff's patents.

## XXI.

Claim 10 of Ferngren Patent No. 2,175,053 is invalid as representing double patenting over Claim 19 of Ferngren Patent No. 2,128,239.

## XXII.

The claims in suit do not merely claim the function of a machine but, with the exception of Claim 10 of Ferngren No. 2,175,053, claim a patentable process.

## XXIV.

The combination of the methods of the patents in suit and polyethylene has had remarkable and extraordinary commercial success. Absent either the processes of the patents or the polyethylene, there would have been no commercial success so far as hollow containers are concerned.

The District Court, therefore, concluded and held that Claims 8, 19, 20, 21, 23 and 26 of Ferngren Patent No. 2,128,239, Claim 11 of Ferngren Patent No. 2,175,053 and Claim 6 of Kopitke Patent No. 2,349,177 were valid, and that Claim 10 of Ferngren No. 2,175,053 was invalid.

Without the testimony of any experts as to the validity of the patents in suit over prior patents there was a presumption of validity over the Heist, Armstrong and Soubier patents for the reason that the first two of these patents had been cited by the Patent Office against Ferngren No. 2,128,239, and the third against Kopitke No. 2,349,177, and the Patent Office had allowed the plaintiff's patents over these citations.

These findings of fact of the District Court as to the distinction between the blowing of hollow articles of glass and the making of hollow articles of organic plastic materials are fully sustained by the testimony of the plaintiff's witnesses. Plaintiff's expert witness, Mr. Richardson, had had a long and varied experience in the field of plastics, while Mr. Peiler, who also testified for the plaintiff, was experienced in the art of making hollow articles of glass. Mr. Richardson explained in great detail the difficulties encountered in making hollow articles of organic plastic material, difficulties peculiar to the use of such materials. Mr. Peiler testified that the Howard patent, named by the defendant as its best reference of prior art, was owned by the Emhardt Manufacturing Company, of which corporation the plaintiff was a wholly owned subsidiary. Mr. Peiler explained that the parent company had experimented for approximately three years, at an expense of $70,000, and had not been able to produce commercially salable blown glass hollow articles by the process described in that patent. He said that the process disclosed by the Howard patent had never been used commercially. Mr. Griffith, the vice president and general manager of the plaintiff company, testified that it had paid in excess of $200,000 for the patents in suit. It is inconceivable that the company would have done this if the Howard patent had disclosed a practical process for making hollow articles of organic plastic material. Mr. Peiler also testified that the method of making hollow articles of glass as disclosed by the Soubier patent could not produce a satisfactory hollow glass article. Mr. Richardson testified that the method of making hollow articles of gutta-percha, as disclosed by the Armstrong Patent No. 8,180, would not be practical because the closing of the end of the tube by pinching together, as shown in that process, would not result in a sufficient weld to prevent the end of the tube from opening upon the application of fluid pressure. Richardson also fully explained the differences disclosed in the patents in suit and the Heist Patent No. 1,654,647.

The practicability of these various processes and the experience gained in their attempted use were matters with which these witnesses were acquainted. If these witnesses were telling the truth their testimony fully sustained the findings of the trial court on the question of the validity of the patents in suit over the prior patents. The trial court heard them testify and we do not have documentary evidence to refute their statements. The credibility of these witnesses was, therefore, a question for the determination of the trial judge. We are not at liberty to disturb a decision supported by such evidence. Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672. We think that the decision of the District Court as to the validity of the patents in suit over these prior patents was correct.

We think it is equally clear from the evidence as to the experiments performed and the many unsuccessful attempts to devise a successful process for forming hollow articles from organic plastic materials that the plaintiff's development of the patented processes amounted to invention.

We also agree with the District Court that Claim 10 of Ferngren-053 was invalid as representing double patenting over Claim 19 of Ferngren-239. But we cannot agree with the District Court that Claim 11 of Ferngren-053 escapes invalidity "by containing elements additional to those of Claim 19 of Ferngren No. 2,128,039." The only step of the process shown in Claim 11 which was not described in Claim 10 was the preliminary step of "subjecting the material in a comminuted form to both heat and pressure to convert it to a plastic and moldable condition."

As we have pointed out above in our discussion of the question of infringement, the patentee, Ferngren, in the specifications of his No. 2,230,188 patent, explained that the bringing of the organic plastic material to a plastic and moldable condition by the simultaneous application of heat and pressure while the material was in a comminuted form was no part of his invention but was disclosed by the Gordon patent issued November 14, 1933, almost three years be-

fore Ferngren filed the application for his No. 2,175,053 patent. The addition to Claim 11 of this one old step cannot avoid invalidity from double patenting.

We, therefore, think that Claim 11 of Ferngren No. 2,175,053 is also clearly invalid—the type of claim which Federal courts are admonished by Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644 to strike down for invalidity in infringement suits even though non-infringement is also found. Wabash Corp. v. Ross Electric Corp., 2 Cir., 187 F.2d 577; Patent Scaffolding Co., Inc. v. Upright, Inc., 9 Cir., 194 F.2d 457.

The judgment of the District Court is affirmed as to those parts of the judgment holding that Claims 7, 8, 19, 20, 21, 23 and 26 of Ferngren Patent No. 2,-128,239 and Claim 6 of Kopitke Patent No. 2,349,177 are valid and as to that part of the judgment holding that Claim 7 of Ferngren No. 2,128,239 and Claim 16 of Ferngren No. 2,230,188 were not infringed.

All those parts of the judgment holding that the defendant has infringed Claims 8, 19, 20, 21, 23 and 26 of Ferngren Patent No. 2,128,239, Claim 11 of Ferngren Patent No. 2,175,053 and Claim 6 of Kopitke Patent No. 2,349,177, and that part of the judgment holding that Claim 11 of Ferngren Patent No. 2,175,053 is valid, are reversed.

The cause is remanded to the District Court with instructions to enter a judgment in conformity with this opinion.