**CONTINENTAL CAN COMPANY, Inc.,**
**Plaintiff,**

v.

**ANCHOR HOCKING GLASS CORPO-**
**RATION, Defendant.**

**Civ. A. No. 64 C 60.**

United States District Court
N. D. Illinois, E. D.

Aug. 17, 1965.

3. Railway Express Agency v. Mackay, 8 Cir., 181 F.2d 257, 259, 19 A.L.R.2d 1248.

4. N. L. R. B. v. Joseph Antell, Inc., 1 Cir., 358 F.2d 880, 883.

Raymond L. Greist, Fred S. Lockwood, John L. Alex, Greist, Lockwood, Greenawalt & Dewey, Chicago, Ill., William A. Dittmann, Chicago, Ill., of counsel, for plaintiff.

James P. Hume, Granger Cook, Jr., Hume, Groen, Clement & Hume, Chicago, Ill., Jack D. Voss, Chicago, Ill., Norman N. Holland, New York City, of counsel, for defendant.

## MEMORANDUM OF DECISION

JULIUS J. HOFFMAN, District Judge.

The extraordinary standard of living in the United States derives in no small part from the industry and genius of scientists and lawyers, the incentive for invention protected by a sympathetic legal system which at the same time encourages competition where monopoly is not due. We are concerned here with the most minute detail in that standard of living. The validity of two patents is at issue. One patent teaches the shape in which to construct a plastisol gasket for a cap so that it seals a glass jar of food properly. The other teaches the lubricants to include in the plastisol so that the user can get the cap off of a properly sealed jar easily without the aid of any tools. Literally years of labor and thought have been devoted by scientists and lawyers to assuring that the correct scientific answers and the correct legal answers prevail as to this minute detail.

Surely the record and exhibits in the instant case would provide an excellent object lesson to anyone seeking an explanation of what has gone into the making of America's standard of living. I trust that this opinion would not have to be omitted from that object lesson.

In the case of both patents, the inventor sought through experimentation to solve a problem and after many experiments hit upon a satisfactory solution which he proceeded to patent. The resulting product is the metal cap for food jars familiar to all housewives under the trade mark, "Twist-Off." The plaintiff owns both of the patents. The defendant admittedly is engaged in infringement if the patents are valid. Defendant claims the right to make and sell the infringing closure caps on the ground that the patents are invalid for a variety of reasons, the chief of which is the obviousness of the alleged inventions in view of the prior state of the art.

## THE PARTIES TO THE SUIT

The plaintiff is the Continental Can Corporation, Inc., a New York corporation. The patents originally issued to employees of the White Cap Company and were later assigned to their employer. The trade mark "Twist-Off" used on the caps manufactured under these patents is registered in the name of the White Cap Company.

The White Cap Company was organized in Chicago about forty years ago by the three White brothers and specialized in the manufacture of metal closure caps for jar containers. About January 1, 1956 the White Cap Company became a wholly owned subsidiary of the plaintiff Continental Can Company and about January 1, 1960 became a division. The White Cap division of the plaintiff manufactures and sells not only metal closures for glass jars but also manufactures, sells and services the sealing equipment used to seal these closures onto jars. Its main customers are processors of food products. The plaintiff admittedly owns both of the patents here involved, including all claims for past

infringement, and has the right to maintain this suit for infringement.

The defendant, Anchor Hocking Glass Corporation, a Delaware corporation, is a competing manufacturer of closure caps for glass jars. The defendant responded to the amended complaint filed herein by answer and counterclaim seeking a declaration that the two patents sued upon were invalid and hence not infringed.

The parties have stipulated that this Court has jurisdiction of the parties and the subject matter, and, for purposes of this suit only, they have waived any question of venue.

## THE USE OF RUBBER GASKETS ON CLOSURE CAPS PRIOR TO THE INTRODUCTION OF PLASTISOLS

From its inception until the inventions here in issue, the type of cap supplied by White Cap for the use on jars containing products requiring vacuum sealing was of the side seal, press-on, pry-off variety made for wide mouthed glass jars. This type of cap carried on its interior an annular or ring-like gasket within the outer margin of the top panel of the cap. The gasket was preformed of rubber and then mechanically crimped or secured in place. This gasket provided the hermetic, leak-proof seal which closed each glass jar and kept the contents in good condition until opened.

Caps of side seal, press-on, pry-off type were applied automatically by White Cap side seal machines operating in a manner whereby steam would be blown into the head space of the jar just as the cap touched the jar at a sufficient angle to admit the steam. The cap was immediately pushed into place and sealed to catch and hold the steam. When the jar cooled the reduction in volume as the steam condensed would form a vacuum within the jar which would perfect the hermetic sealing and hold on the cap.

Three disadvantages inhering in the use of the foregoing type of cap led White Cap to conduct research looking for an improved type of cap. Surveys of consumers showed that the housewife wanted her jars of food to come with a cap which could be used to close the jar after it had been opened. Consumers found it difficult if not impossible in most instances to use the press-on, pry-off cap to reseal the jar because the cap was usually bent out of shape in the process of prying it off. The housewife also was asking for a jar which she could open without the need to use any tool or instrument whereas the press-on, pry-off caps on the market required some tool. And a more satisfactory material than rubber was desired for the gaskets as rubber was not sufficiently impervious to oxygen, water or other fluids, did not have a desirable appearance, sometimes affected the taste of some foods, and was difficult and expensive to use as a gasket.

In the early 1950's, the Crown, Cork and Seal Company began manufacturing and selling a twist cap having lugs and a cut rubber ring gasket, together with a vacuum sealing machine for applying such caps. White Cap's customers voiced their dissatisfaction with the old side seal, press-on, pry-off caps. Accordingly, in the latter part of 1952 or the early part of 1953 White Cap began working on the production of a new cap, trying out, among other products, the use of plastisols as the material for the gasket.

## THE PROBLEMS ENCOUNTERED IN DEVISING A SATISFACTORY PLASTISOL GASKET

Plastisol has several characteristics which would be desirable in the construction of a gasket for jar closures. The process involving the use of plastisol is much simpler and less expensive than that involving rubber. Plastisol does not need to be preformed as does rubber. Instead plastisol can be poured or flowed easily into closure shells. Plastisol cures in a few minutes whereas rubber requires several hours. In addition, plastisol is clean appearing, non-toxic, compatible with many food products, and highly impervious to water or air.

Plastisols had been developed in Germany and became available in the United

States after World War II. Foye Patent 2,528,507, application filed in 1947 and patent issued in 1950, owned by Dewey and Almy Chemical Company, taught the use of plastisols as a sealing composition for glass containers.

Donald A. Zipper, director of research for the White Cap Division of the Continental Can Company, was in charge of devising the gasket for the new cap. Zipper was a scientist trained in physical chemistry and during his former employment with the Armour Research Foundation had worked from 1946 until 1950 on problems of corrosion in jar closures for White Cap which had hired the Armour Research Foundation to investigate this problem. In 1950 Zipper left Armour Research Foundation and became an employee of White Cap where he continued to work on the corrosion problem.

During the latter part of 1952 and early 1953 Zipper conducted experiments to determine if plastisol was compatible with food. He determined that it was. He then experimented to find a suitable enamel or lacquer which would cover the metal used to construct the cap and at the same time adhere the plastisol when poured into the cap to form a gasket. By 1954 Zipper was ready to construct a top seal, quarter-turn lug cap, with a plastisol gasket providing the seal. The cap was designed with a stacking panel, already a well established feature in the cap industry. In a cap with a stacking panel the top of the cap consists of tinplate bent so as to form two levels, a large depressed flat circular section comprising the main portion of the top of the cap, surrounded by a slightly higher flat, narrow ring around the edge about the width of the usual gasket. The purpose of the stacking panel is to permit a glass jar having a base the same size as the depressed flat panel to sit on top of the jar without sliding off, so that in the store the jars may be stacked on top of each other. When turned upside down the narrow outer ring provided a channel into which the liquid plastisol could be poured and confined until it fluxed to form a gasket.

Samples of the cap as designed by Zipper were constructed in early 1954 and Zipper conducted "abuse tests" at the White Cap plant to determine whether the new closure would stay on, withstand shipment and hold the product.

By June 1954 Zipper had developed a plastisol gasketed cap which he was ready to test in a customer's plant under commercial packing conditions. A new experimental lug capping machine together with a substantial number of the new experimental plastisol gasketed caps were shipped to the Libby, McNeill & Libby Plant near Portland, Oregon. Between June 3 and 19, 1954, these plastisol gasketed caps were used to cap jars of pickles as part of a commercial operation.

The test at Libby, McNeill & Libby showed that the plastisol gasketed caps were a failure. In much too large a number of instances the cap blew off because there was no sealing at all effected. This was called a "blow out" or a "dud" in the industry. In other instances the plastisol gaskets either slid out of place or lifted, taking with them the protective layers of coating of enamel or lacquer and exposing the metal in the cap to corrosion. These were baffling defects which showed up for the first time in this field test. Loss of adhesion of the plastisol gasket to the cap had not been shown in White Cap's laboratory tests and was caused by the heat and pressure conditions imposed on the caps in the course of applying heat to the processed pickles.

Some of the jars of pickles which appeared to have been successfully sealed with the new experimental plastisol gasketed cap during the test run at Libby, McNeill & Libby were set aside and measurements made over a period of time as to whether the jars became more difficult to open the longer they stand. The ease with which a cap can be removed is measured in inch pounds necessary to rotate the closure off a jar. This is given a value known as the opening torque. The record of the opening torque figures on the new plastisol gasketed caps used in the test run at Libby, McNeill & Libby

in June 1954, showed a tendency for the opening or removal torques of the caps to increase with age or shelf-life.

Since the particular cap used in the test at Libby, McNeill & Libby had a small diameter, the torque removal problem as to this cap was not considered to be too serious but it was realized that it might be a serious problem with a cap having a larger diameter. Therefore, efforts were made to improve the removal torques of the plastisol gasketed caps and many ingredients were tried. While this work on lowering removal torques was in progress, White Cap encountered a very serious instance of the problem of extremely high removal torques in connection with some large size plastisol gasketed caps tried out at Derby Foods on a large peanut butter jar. As a result of this trouble at Derby Foods, efforts to solve the torque control problem were intensified.

## THE INVENTION OF ZIPPER PATENT NO. 2,841,304

Efforts at White Cap to solve the problem created by the loss of adhesion of the plastisol gasket were directed to finding an enamel or lacquer to which the plastisol would adhere under all conditions involved in sealing and processing of jars of food. Zipper began by devising hundreds of different formulas for enamel, painting them on caps, inserting the plastisol and trying the completed cap on jars under conditions simulating those encountered in commercial production. The slowness of this procedure led Zipper to devise a more rapid procedure for testing which enamels provided plastisol the best adhesion.

Zipper devised a procedure wherein the enamel to be tested was painted onto a flat piece of tinplate of the same type as is used in the construction of the closure caps. Plastisol was then poured on top of the enamel to form a thin strip resembling in thickness the gasket. The strips of plastisol on top of the enamel on top of the tinplate were then fluxed by heating. The tinplate was then bent over a quarter inch rod at right angles to the plastisol strip so that the plastisol strip was on the outside of the bend. The plastisol strips were thereupon slit with a razor blade at the edge of the bend in a line parallel with the bend.

The resulting specimen was immersed in water for one minute intervals at increasing temperatures. After each interval the specimen was removed and examined to see whether or not the plastisol had separated from the panel. The failure point was reached when the plastisol had opened at the razor slits and the thick portion had separated from the panel. This plastisol adhesion test became known at White Cap by its initials, P.A.T.

After Zipper had been running his P.A.T. tests for about three weeks he realized for the first time that there was a part of the plastisol which never lifted —namely, the thin section at each edge of the plastisol strips where the plastisol paste had been sufficiently fluid to thin out at each side before it assumed its relatively stable state after fluxing. Zipper analyzed the reason for this and came to the conclusion that the flexibility of the extremely thin edges caused them to stretch instead of pull loose when pressure was supplied, whereas the thicker portions of the plastisol had less flexibility and hence pulled loose from the tinplate when pressure was applied in a direction which tended to separate them from the tinplate.

It then occurred to Zipper that the same principle could be applied to solve his problem of blowouts and lifting of gaskets. The plastisol gasket could be constructed with a thin edge on each side which should prevent loss of adhesion and lifting. The mechanical accomplishment of a gasket would be simple. The plastisol could be poured a little thicker in the channel around the stacking panel so that it would overflow and form a thin layer extended over the shoulder of the channel and onto the top panel for a sufficient distance to provide a flexible strip long enough so that the distorting forces present when a cap was pressed down and turned during sealing would be dissi-

pated before reaching the edge of the strip. The edge would then hold and provide a cover against any corrosion if the plastisol did pull off down in the channel.

Zipper started the P.A.T. tests around the first part of August 1954, and made his observations with respect to the non-loss of adhesion of the thin film-like marginal sections of the plastisol strips around the latter part of August 1954. He communicated his observations to his fellow research engineers and requested that caps incorporating his proposal be constructed. Caps were then constructed so that the plastisol annular gaskets had the film-like anchoring portions of appreciable width which extended inwardly well beyond the channel shoulder. Testing established that Zipper's analysis had been correct. The thin anchoring portions retained their adhesion even though the thick portions of the gaskets within the channel lifted. The lifting of the thick portions was harmless because the edges held firmly and prevented any seepage into the lifted area. Hence the sealing problem and no corrosion problem were solved.

White Cap commenced commercially producing and selling plastisol gasketed top seal lug caps incorporating this feature sometime prior to September 24, 1954. On September 24, 1954, the first drawing of his invention was made.

Zipper filed his application for a patent on July 8, 1955, and was issued Patent No. 2,841,304 on July 1, 1958. Zipper first conceived the invention, disclosed in Zipper Patent No. 2,841,304, in the latter part of August, 1954, reduced it to practice sometime prior to September 24, 1954, and had the first drawings thereof made on September 24, 1954. Therefore, for the purpose of establishing priority, Zipper is entitled to a date of invention at least as early as the latter part of August, 1954.

As issued, Zipper Patent No. 2,841,304 included three claims, each confined to the use of an anchoring portion on plastisol gaskets in closures for glass containers. Claim 1 contains no specifica-tion of the width of the anchoring portion other than it shall be of "appreciable width" and hence covers any anchoring portion of appreciable width. Claim 2 covers an anchoring portion having a width at least equal to the thickness of the gasket in the channel. Claim 3 covers an anchoring portion having a width at least equal to the radial width of the inclined portion of the shoulder of the channel. From the period of November 1957 until September 1958, the defendant's accused caps infringed only Claims 1 and 2. Since July 1963, the defendant has been manufacturing and selling caps which infringe all 3 claims. No issue has been raised in this case which requires any separate consideration of the various claims.

### DEFENDANT HAS INFRINGED ZIPPER PATENT NO. 2,841,304

The defendant began selling infringing caps sometime between November 22, 1957 and January 1958. The fact that the caps do infringe if the patent is valid is not disputed. This was the first plastisol gasketed cap which defendant sold. The defendant's principal witness, Alex W. Hart, Assistant Director of Package Development for the defendant, when pressed by the Court for a direct answer to the question of whether the defendant had copied the plaintiff's cap, admitted unqualifiedly that the defendant had done nothing more than copy the plaintiff's plastisol gasketed cap, at the time that the defendant came out with its first plastisol gasketed cap (Tr. 1150–1152). Hart admitted that the defendant was aware of White Cap's development of a plastisol gasketed cap at the time White Cap was developing it (Tr. 1045). Hart also admitted that when he began trying to develop a plastisol gasketed cap in 1957, he was already fully acquainted with plaintiff's cap (Tr. 1044).

Plaintiff, by a letter dated August 13, 1959 from Mr. Philip O. C. White, President of White Cap Company, to Mr. William V. Fisher, the then President of defendant, advised Mr. Fisher of the issuance of the Zipper Patent No. 2,841,-

304, pointed out that certain specimens of closures manufactured by defendant appeared to infringe and requested Mr. Fisher to look over the patent and then advise that the defendant would not make any use of the features that were covered by the patent.

By a letter dated August 19, 1958, Mr. Fisher advised Mr. White that defendant's patent counsel was investigating the claimed infringement. On September 10, 1958, Mr. Fisher wrote a further letter to Mr. White in the first paragraph of which he told Mr. White that defendant's patent counsel had advised that the Zipper patent was invalid for various reasons. In the second paragraph he told Mr. White that he was sending to him under separate cover samples of new closures which defendant was selling as an improvement on former closures, and that patent counsel advised the enclosed closures did not infringe the Zipper patent. In the last paragraph Mr. Fisher stated that the new improved closures were being submitted without prejudice to defendant's rights to manufacture and sell closure caps with an overlap gasket and without acquiescence in the validity or scope of the Zipper patent.

Mr. White on October 1, 1958 replied conceding the closures submitted did not infringe and suggested that the allegations of invalidity of the Zipper patent be taken up between patent counsel for the respective companies.

On October 21, 1958, Mr. Fisher wrote a responding letter disclaiming any reason for a meeting between their patent counsel.

Defendant ceased making and selling caps having top seal plastisol gaskets with an anchoring edge in September 1958 and did not resume their manufacture and sale until July 1963. The cessation was due to plaintiff's claim of infringement of the Zipper patent.

In or about September, 1958, defendant, after stopping the manufacture and sale of the accused caps, started manufacturing and selling caps having a top seal plastisol gasket which was wholly confined within the cap channel, thus eliminating the thin anchoring edge. Defendant met the problems of lift and corrosion by changing from the two-coat protective coating system it had previously used for painting the tinplate before insertion of the plastisol on the accused caps to a three-coat system which included an added organasol coating. This provided good corrosion resistance and good adhesion to the plastisol gasket. The use of the three-coat system increased the cost of the caps and also created a nuisance problem in manufacture due to fumes from volatilized plastisol.

The decision made in or about September 1958, that defendant would discontinue making closure caps which incorporated the plastisol gasket with a thin anchoring edge was made on behalf of the defendant by Mr. William V. Fisher, its then president, and by Mr. Russell P. Herrold, its then vice president and manager of its Closure Division. This decision was adhered to during the tenure of Mr. Herrold and there was no infringement of the Zipper patent by the defendant during the period between about September, 1958, and July, 1963. Sometime after Mr. Herrold's retirement in February, 1963, the decision was made by Mr. James E. Goddard, Mr. Herrold's successor, that defendant would resume the manufacture and sale of the accused closure caps. This decision by Mr. Goddard was concurred in by defendant's then president Mr. Gushman, but it was not until a long time afterward that Mr. Fisher who had become chairman of the executive board, and the defendant's chief executive officer, learned of the change. His best recollection was that he had not learned of the resumption of the manufacture and sale of the accused cap until he was told by his lawyers of the institution of the case at bar. In his deposition in this case Mr. Fisher testified he did not know whether he had ever had occasion to approve or disapprove of the resumption of manufacture and sale of the accused device (Tr. 1939).

The record in this case compels the finding that the officers in charge of the defendant's cap manufacture from 1958 to February 1963 were convinced that plaintiff's Zipper Patent No. 2,841,304 was valid. Otherwise they would not have abandoned the manufacture of the accused cap when plaintiff gave them notice and thereafter continued for almost five years to let the defendant limp along in the field of closure cap production with a cap which was so much less desirable because of its greater cost of production and the fume nuisance problem.

The failure either to consult or even to inform the chief executive officer of the defendant when it resumed the manufacture of the accused cap, indicates that the new head of the closure cap division and the new president were well aware that they had no reasonable basis for challenging the validity of the Zipper patent. There is no evidence in the record to explain their conduct in this regard. We can only conclude that they decided that it would be more advantageous to infringe for several years than to obey the law, and knew that William V. Fisher would not acquiesce in this flagrant violation of the Zipper patent. This was just the type of situation for which Congress devised the statutory authority to courts to award treble damages, expenses and attorneys' fees. 35 U.S.C. § 284.

■ The defendant's violation of Zipper Patent No. 2,841,304 was wilful and deliberate. As hereinafter set forth the numerous attacks made by the defendant upon the validity of Zipper Patent No. 2,841,304 are each so obviously lacking in merit that I cannot conclude that the defendant had any good faith belief that the patent was invalid. Hence the plaintiff is entitled to recover its damages, its expenses, costs of litigation and attorneys' fees with respect to so much of this case as pertains to the Zipper Patent No. 2,841,304.

## THE INVENTION EMBODIED IN ZIPPER PATENT NO. 2,841,304 WAS NOT ANTICIPATED BY PRIOR PATENTS OR PRACTICES

The defendant cites a number of prior patents, instances of earlier caps, and publications showing that the gasket material was extended to cover the shoulder between the gasket channel and the flat central stacking panel of a closure cap. In all patents and instances cited involving an extension of the gasket material over the shoulder the gasket was composed of some form of rubber. In none of them was the gasket material plastisol.

■ It is well settled law that the substitution of a new material or different material, which does not involve any change of method or develop novelty of use, is not a patentable invention. Hotchkiss v. Greenwood, 11 How. 248, 52 U.S. 248, 261, 13 L.Ed. 683; Associated Plastics Companies v. Gits Molding Corp., 182 F.2d 1000, 1005 (7th Cir., 1950).

Here, however, when the plastisol was made into a gasket in the shape previously used for rubber gaskets, the result was completely unsatisfactory. Rubber either adhered to the cap or if it came loose at any point, it did not in so doing remove the enamel or lacquer from the tinplate and leave it bare to corrosion. The plastisol, while having many qualities which made it superior to rubber for purposes of gaskets, had the defect that it came loose and in so doing took off the coating of enamel or lacquer and left the tinplate exposed to corrosion. Plastisols attack enamel or lacquer in a debasing fashion not hitherto found to exist in any material used for gaskets. This debasement created corrosion problems when the heat and pressure of sealing pulled the thick portions of plastisol off the cap, taking with it the coating on the tinplate. Thus, the use of plastisol created a problem of lifting off the enamel or lacquer on the inside of the cap which had never before been encountered in the manufacture of gaskets.

Nor did any of the patents or prior instances of use of an extended edge covering the shoulder with a widened rubber gasket show the use of a thin anchoring portion. The instances relied upon by defendant showed an extension of the rubber to cover the shoulder but no thin anchoring portion. This was unnecessary when rubber was the material used because the rubber adhered at all points without any tendency to lift or remove the enamel or lacquer coating.

The Zipper invention, therefore, dealt with a problem not present when rubber was used as a gasket material. Compare Plax Corp. v. Elmer E. Mills Corp., 204 F.2d 302, 310 (7th Cir., 1953). And the Zipper invention by solving this problem with a thin anchoring portion of the gasket, taught a construction not disclosed by any prior patent, publication, or practice offered by defendant.

The defendant has not shown a single instance either of a patent, publication, or prior practice which disclosed the use of a thin anchoring edge on the gasket, either composed of rubber or plastisol or any other material. Nor did defendant show the use of a thin anchoring strip on any object other than a gasket, whether composed of rubber, plastisol or other material. The use of the thin anchoring portion is what the Zipper invention is about. No anticipation has been shown.

## THE INVENTION EMBODIED IN ZIPPER PATENT NO. 2,841,304 WAS NOT OBVIOUS

The number of years during which the industry tried but failed to make a commercially successful cap with a plastisol gasket leaves no doubt that the Zipper invention was not obvious.

Before the defendant began copying the Zipper invention, the defendant spent approximately a year trying to develop a satisfactory plastic gasket. In many instances the plastisol gaskets did not stick well but would lift off and prevent the obtaining of a good seal. When a food product would get under the lifted gasket it would produce a leaker. No evidence was submitted by the defendant to explain the long delay that preceded the introduction of its first commercial plastisol gasketed cap. The defendant knew of plastisol gasketing material as early as 1947 and Hart testified that the Dewey & Almy Company had submitted its plastisol compounds and had offered its assistance to the defendant in producing caps with such compounds as early as the late 1940's.

That it was not obvious to construct a plastisol gasket in such a way as to produce inwardly of the gasket in the channel a thin annular, film-like anchoring portion of the plastisol gasket extending across the inner shoulder of the channel and on towards the middle of the center cap panel as disclosed and claimed in the Zipper patent, is shown by the fact that when Dewey & Almy, then White Cap, and later the defendant, all highly skilled cap people, first attempted to make a plastisol gasketed top seal cap, each of these three concerns confined the plastisol within the channel. In Figs. 5 and 6 of Foye Patent No. 2,528,507, which issued to Dewey & Almy, the plastisol was confined to the channel. Likewise in the first caps that White Cap produced and submitted to the field test at the Portland, Oregon, plant of Libby, McNeill & Libby in June 1954, the plastisol was confined to the channel. Also, the first caps which defendant produced and field tested had the plastisol confined to the channel.

None of the foregoing caps with plastisol confined in the channel was acceptable. The type of experimentation conducted by the plaintiff and others and the length of time the industry spent before Zipper's invention made possible the first successful cap having a plastisol top seal gasket, establish that Zipper's invention was not obvious. Copeman Laboratories Co. v. General Plastics Corp., 149 F.2d 962, 964 (7th Cir., 1945); Plax Corp. v. Elmer E. Mills Corp., 204 F.2d 302, 310 (7th Cir., 1953).

## THE INVENTION EMBODIED IN ZIPPER PATENT NO. 2,841,304 WAS A COMMERCIAL SUCCESS

The invention embodied in Zipper Patent No. 2,841,304 was immediately adopted by White Cap in the production of its commercial caps and has been used continuously by White Cap since a short time prior to September 24, 1954. At that time White Cap was making and selling the side seal, press-on, pry-off caps with cut rubber gaskets for use on wide mouth glass containers. The number of quarter-turn, top seal, plastisol gasketed lug caps incorporating the Zipper invention, that were shipped by White Cap in 1954, represented but a very small percentage of its total shipments of press-on, pry-off side seal caps. In 1955 the percentage of Zipper invention type caps increased some but was still very small. The proportion of Zipper invention type caps increased substantially in 1957.

In 1955 the side seal, press-on, pry-off type caps plus the Zipper invention type caps together constituted 70 per cent of the White Cap total cap business with Zipper invention type caps constituting but 3 per cent of this 70 per cent. In 1957, caps embodying the Zipper invention together with the side seal, press-on, pry-off caps constituted approximately 60 per cent of White Cap's total cap business with Zipper invention caps comprising about 55 per cent of this 60 per cent.

In 1964, shipments of caps embodying the Zipper invention together with the side seal, press-on, pry-off caps constituted approximately 60 per cent of White Cap's total cap business with Zipper invention caps comprising approximately 90 per cent of this 60 per cent. During each year starting with 1958 and continuing down to date White Cap has shipped in excess of one billion (1,000,-000,000) caps embodying the Zipper invention.

■ This resounding commercial success tends strongly to overcome the unsupported charge that the Zipper invention was obvious. Compare Otto v. Koppers Company, 246 F.2d 789, 799, 800 (4th Cir., 1957).

## THERE WAS NO CONTRACTUAL UNDERTAKING BY DEFENDANT TO REFRAIN FROM USING THE ZIPPER INVENTION

In view of the determination herein made that Zipper Patent No. 2,841,304 is valid and infringed, any ruling on plaintiff's contentions that in any event defendant has contracted not to use the Zipper invention, has very little consequence. Nevertheless, since the second claim for relief stated in the amended complaint sounds in contract, a complete disposition of the case requires a ruling on the alleged contract.

■ It is the plaintiff's contention that the exchange of letters between White and Fisher in August, September and October 1958, which has already been set forth, together with plaintiff's forbearance to sue during the ensuing years prior to the defendant's resumption of infringement, constituted a contract. The plaintiff would have this Court imply a promise on the part of the defendant not to use the Zipper invention in return for the plaintiff's forbearance from suing for the infringing acts committed during 1957 and 1958. The record however affords no basis for finding any such implied promise. I hold that defendant never entered into any contract with plaintiff with respect to the use of the Zipper invention.

Judgment for the defendant with prejudice must be entered on the second claim for relief.

## THE INVENTION OF UNGER AND ZIPPER PATENT NO. 2,874,863

After the field test of plastisol gasketed caps at Libby, McNeill & Libby in June, 1954 established the need to reduce opening torque, White Cap conducted experiments to determine what chemicals would solve its torque problem.

Controlled torque lubrication of plastisol gasketed closure caps of the twist

type involves three primary considerations. One consideration is that of having the gaskets properly lubricated so that the caps lend themselves to application by high speed automatic machines. A second consideration is that the caps after being machine-applied must remain in place at the point of greatest rotation without exhibiting a tendency to counterturn or back-off. The third consideration is that the caps must exhibit desirable opening torques for the consumer even after long package shelf life. With respect to the third consideration, namely, proper lubrication for desirable opening torques, it is possible to have removal torques which are so low as to impair the seal security of the package. Aside from the three-fold considerations with respect to properly controlled torque lubrication, there are other factors to be considered including the ease with which a lubricant can be dispersed in the compound, cost and compatability with product.

The plaintiff's experience with the use of paraffin wax alone as a lubricant for plastisol gaskets in twist caps proved unsatisfactory, especially where the caps were of large diameter such as were furnished to Derby Foods for use on large jars of peanut butter. The warm paraffin acts as an excellent lubricant in aiding in putting on the caps and sealing them. The hardening effect transmitted by the cooling of the paraffin tends to preserve a satisfactory seal. But the opening is unduly difficult.

The use of polybutene in combination with paraffin resulted in closure caps exhibiting back off tendencies.

The use of a lubricant system based on silicone fluid in combination with paraffin and lecithin proved to be the most satisfactory. This formulation was designated by White Cap with the laboratory code C–267 and has also been designated by the abbreviation T.O.T.

After Compound C–267 had been preliminarily tested in the laboratories at White Cap, it was field tested in customers' plants. The first field trial of C–267 compound was in the plant of a customer of White Cap—J. M. Smucker Company of Orrville, Ohio. The test was conducted by Donald H. Zipper and Roger B. White on March 13, 1956.

Harold W. Unger prepared a memorandum of invention on the use of silicone fluid, lecithin and paraffin wax in plastisol gaskets dated January 29, 1957. This invention disclosure, supplemented by discussion with patent counsel and other test work, was used as the basis for preparing an application for patent which eventuated into Unger and Zipper Patent No. 2,874,863, application filed April 1, 1957, patent issued February 24, 1959.

The Unger and Zipper Patent No. 2,874,863 is entitled "Controlled Torque Gasket Compositions" and contains 35 claims for the use of silicone fluid, with or without paraffin and/or lecithin in varying proportions and combinations, in plastisol gasket compositions for closure caps and particularly closure caps of the rotary type.

THE CLAIMS OF UNGER AND ZIPPER PATENT NO. 2,874,863 WHICH HAVE ALLEGEDLY BEEN INFRINGED BY DEFENDANT

The defendant has admittedly infringed certain claims of the Unger, et al. patent, if that patent is valid. There is no dispute between the parties as to which claims have been infringed, if those claims are valid. Nor is there any dispute as to the dates the allegedly infringing acts took place.

The trial stipulation provides that plaintiff asserts that only claims 5, 9, 15, 23 and 24 of the Unger and Zipper Patent No. 2,874,863 are infringed by defendant's manufacture, use and/or sale of rotatable caps and closure members having gaskets which comprise a vinyl chloride base resin and silicone fluid in an amount within the range of from 0.5 per cent to 15 per cent by weight for providing at least a part of the lubrication thereof. The trial stipulation also provides that plaintiff asserts that only claims 3, 5, 9, 10, 15, 16, 23, 24, 25 and 26

are infringed by defendant's manufacture, use and/or sale of rotatable closure caps and closure members having gaskets which comprise a vinyl chloride base resin, from .05 per cent to 15 per cent by weight of silicone fluid and from about 1 per cent to 10 per cent by weight of paraffin, for providing at least part of the lubrication thereof.

All of the asserted claims define the gasket compositions as "a vinyl chloride base resin" including certain named lubricants. One set of the asserted claims is directed only to the compositions as such, whereas the other set is directed to closure caps employing such compositions. Certain of the claims of both sets define the lubricant as "a silicone fluid," and the remaining claims of both sets define the lubricant as "a silicone fluid and paraffin."

Certain of the composition claims define the quantity of lubricant as sufficient in amount "to be present on the surface of a gasket formed from said composition and provide lubrication thereto," whereas others specify quantities of "from about 0.5 per cent to 15 per cent by weight for the silicone fluid" and "from about 1 per cent to 10 per cent by weight" for the paraffin. Similar definitions exist in the closure cap claims with respect to the quantities and kinds of lubricant specified and, in addition, certain thereof are directed to a "rotatable cap," whereas others are broader and call for "a closure member" of any kind.

Insofar as the Unger, et al. Patent No. 2,874,863 is concerned, the only caps of defendant accused as infringements are those having gaskets comprising a vinyl chloride base resin employing a silicone oil as a lubricant, without regard to whether or not anything else is also used therewith as a lubricant, or employing a silicone oil and paraffin as lubricants, without regard to whether or not anything else is also used therein as a lubricant. Among the claims asserted as infringed are claims covering the use of any silicone oil or any silicone oil and paraffin, without limitation as to amount or proportions, except the specification of a sufficient amount so as to be present on the surface of a gasket formed from said composition and provide lubrication thereto.

Hence in this suit no issue is raised as to the validity of the claims covering a use of lecithin either alone or in combination.

## THE USE OF SILICONE OIL EITHER ALONE OR WITH PARAFFIN WAS OBVIOUS IN VIEW OF THE PRIOR ART

Prior to the Unger development, the use of silicone fluid in a vinyl chloride base resin of the type called for in the Unger, et al. patent was well known.

Haas Patent No. 2,470,772 (1949) teaches that silicone included in a plastisol composition will bloom to the surface. Column 1, lines 24–28, of the Haas patent lists the materials as to which the invention is useful, and in lines 27–28 lists "plasticized polyvinyl chloride and the like." Column 3, lines 21–24, teaches that silicones may "be compounded directly into the material, preferably in an amount of from 1 per cent to 15 per cent based on the weight of the rubbery material, or similar solid material." Column 3, lines 64–66, teaches that when compounded into rubbery material during the course of its preparation silicones form a tough film over the surface. Column 3, lines 67–68, teaches that this film is freely elastic and extensible and will not be broken when the rubbery material is stretched.

The Foye Patent No. 2,528,507 (1950) discloses a twist cap having a gasket-forming composition comprising a vinyl chloride base resin and paraffin wax.

In Warth Patent No. 2,827,192 (application filed September 23, 1954, patent issued March 18, 1958) silicone oil and paraffin wax as lubricants are included in a rubbery composition for producing jar rings. The silicone oil and paraffin wax are incorporated into the gasket composition prior to formation of the gasket. The silicone oil is identified as Dow Corning DC200 silicone oil, which is the identical silicone fluid disclosed in

the Unger, et al. patent. As stated in Column 2, lines 13–14 of the Warth patent, "The Silicone, specifically a dimethyl siloxane oil, improves the lubricating qualities of the composition."

The Cooke Patent No. 2,796,189 (filed in 1953, issued in 1957) discloses a closure cap having a rubber gasket, the surface of which is coated with silicone fluid. Cooke states in Column 4, lines 6–23, that rubber sealing rings customarily employed in closures are greatly improved by providing a coating of polysiloxane on the surface which contacts with the lip of the containers or glass jars. Polysiloxane is a silicone fluid.

In the "Dow Corning Silicone Note Book," silicone fluids are characterized on the front page as stable fluids useful, amongst others, as lubricants and mold release agents. On page 8, under the heading "as lubricants for rubber," it is stated that DC200 Fluids minimize friction and wear, and prevent the sticking of rubber gaskets to metal surfaces. On page 23, it states that "The DC200 Fluids are among the best lubricants for natural and synthetic rubber and for polystyrene, phenolics and most other plastics." The plastisol or vinyl chloride base resin materials defined in the Unger, et al. patent qualify as plastic materials.

In the book "Silicones And Their Uses," by Rob Roger McGregor, published in 1954, on page 79, it states that commercial silicones as lubricants for plastics have gained wide acceptance. This book, at pages 205 and 210, states that one of the many applications of silicones is as a lubricant for reducing abrasion and friction in rubber seals, and as lubricants for impregnating gaskets and packing.

None of the above-discussed patents and publications was made of record or cited by the Patent Office in the prosecution of Unger, et al. Patent No. 2,-874,863. Accordingly, the statutory presumption of validity is rebutted and eliminated.

No patentable invention inhered in using silicone oil either alone or with paraffin. The use of either or both of these in lubricating either rubber or plastisol by including them in the composition was too well known to justify granting the plaintiff the monopoly here asserted. Unlike the use of plastisol as a gasket on enamel coated tinplate, the use of silicone oil alone or with paraffin in plastisol gaskets functioned in the same manner as its use in rubber gaskets. The Haas Patent No. 2,470,772 (1949) had already taught that silicone oil included in a composition of plastisol blooms to the surface and performs in the same manner as it does included in a rubber composition.

I believe the use here made of silicone and paraffin is much less of an invention than the adding of ACTH to gelatin which our Circuit held was not a patentable invention. Armour & Co. v. Wilson & Co., 274 F.2d 143, 149, 150 (7th Cir., 1960).

Accordingly it is determined that Claims 3, 5, 9, 10, 15, 16, 23, 24 and 25 of Unger and Zipper Patent No. 2,-874,863 are invalid because the invention claimed was obvious to anyone skilled in the prior art.

With respect to Unger and Zipper Patent No. 2,874,863 judgment will be entered for the defendant.

With respect to Zipper Patent No. 2,841,304, a judgment will issue for the plaintiff finding that all 3 claims of the patent are valid and have been infringed by defendant. A writ of injunction will issue restraining defendant from infringing Claims 1, 2 and 3 of Patent No. 2,841,304. The matter will be referred to a Master, to be appointed by the Court, who shall make and render an accounting as to the extent of the manufacture and sale of infringing closure caps and the amount of damages suffered by the plaintiff, and the plaintiff shall recover of the defendant its damages together with its expenses, costs and attorneys' fees, insofar as they are attributable to issues relating to Zipper Patent No. 2,841,304.

The defendant on its counterclaim is entitled to a declaratory judgment that Claims 3, 5, 9, 10, 15, 16, 23, 24 and 25 of Unger and Zipper Patent No. 2,874,-863 are invalid. In all other respects judgment on the counterclaim will be entered for the plaintiff with prejudice. I believe the plaintiff acted in entire good faith in its claim that defendant infringed the Unger and Zipper patent and hence will deny the defendant attorneys' fees and costs.

This memorandum of decision will stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.