**Keith H. WYCOFF and Reach Electronics, Inc., Plaintiffs,**

v.

**MOTOROLA, INC., Defendant.**

**No. 74 C 2661.**

United States District Court, N. D. Illinois, E. D.

Aug. 25, 1980.

Harold V. Stotland, J. Terry Stratman, Vogel, Dithmar, Stotland, Stratman & Levy, Chicago, Ill., for plaintiffs.

Howard W. Clement, Robert L. Harmon, Jerold A. Jacover, Hume, Clement, Brinks, William & Olds, Ltd., Chicago, Ill., for defendant.

1. Any finding of fact which may be more properly termed a conclusion of law shall be deemed a conclusion of law.

2. Although the Reissue patent had been filed prior to the commencement of this action, the complaint charged Motorola with infringement of all claims of the Original patent. After the

**MEMORANDUM OPINION**

ROSZKOWSKI, District Judge.

**FINDINGS OF FACT [1]**

This action was commenced in September, 1974 by Wycoff and Reach charging Motorola with infringement of four U. S. patents owned by Wycoff, including the Original patent. After issuance of the Reissue patent, the Reissue patent was substituted for the Original patent.[2] As a result of a partial settlement, only claims 19 and 20 of the Reissue patent remain in issue.[3] For the reasons herein stated, this court finds in favor of plaintiffs.

Plaintiff Reach Electronics, Inc. ("Reach") is a Nebraska corporation headquartered in Lexington, Nebraska. Plaintiff Keith H. Wycoff ("Wycoff") lives in Lexington, Nebraska and is the president of Reach.

Defendant Motorola, Inc. ("Motorola") is a Delaware corporation with its place of business in Schaumburg, Illinois.

Wycoff is the named inventor and owner of the U. S. Reissue patent in suit, No. Re. 28,222 ("the Reissue patent"), which issued November 5, 1974. Reach is the exclusive licensee of the Reissue patent.

. The Reissue patent is a reissue of U. S. Patent No. 3,651,413 ("the Original patent"), which issued March 21, 1972 on an application filed September 29, 1969. The application for the Reissue patent was filed June 6, 1973 and the Original patent was duly surrendered.

Motorola has stipulated that claims 19 and 20 of the Reissue patent, if valid, read on, and are infringed by, certain pager models made and sold by Motorola and de-

issuance of the Reissue patent, the charge was amended to include claims 6, 19, 20, 22, 26, and 27 of the Reissue patent, and the Original patent was dropped.

3. In the Third Amended Complaint filed herein, claims 6, 22, 26, and 27 were withdrawn.

scribed in Motorola manuals in evidence as PX–10, 17, 120, 121, 152A–C, 158A–B and 159. Thus, infringement is not at issue. The only questions presented for decision here concern the validity and enforceability of claims 19 and 20 of the Reissue patent.

Plaintiffs maintain that Motorola has infringed claims 19 and 20 of the Reissue patent by reason of its manufacture and sale of certain models of its portable paging equipment: specifically, certain tone–only versions of its PAGEBOY II, METRO–PAGEBOY and METRX paging receivers which incorporate a "batter–saving" feature. The accused devices are described in various Motorola manuals.

Motorola contends that claims 19 and 20 of the Reissue patent are invalid under 35 U.S.C. §§ 102(a), (b) and (g),[4] and are unpatentable under 35 U.S.C. § 103,[5] in view of Motorola's QRR–11 development,[6] and are invalid under 35 U.S.C. §§ 102(a) and (b) and 35 U.S.C. § 103 in view of United States Patent No. 2,912,574 to Gensel.

In support of its contentions, defendant has proffered a demolition device known as the QRR–11 receiver developed by Motorola for the United States Government under a classified government contract, and the Gensel Patent, No. 2,912,574, as prior art and the primary basis for invalidating the claims in issue.

Additionally, Motorola contends that claims 19 and 20 are unenforceable because plaintiffs failed, during the prosecution of the Original patent, to bring certain pertinent British references to the attention of the Patent and Trademark Office and, during the prosecution of the Reissue patent, actively misled the Office with respect to the date those references were discovered.

The reissue patent deals with a battery–saving circuit for a communication receiver of the portable, battery–operated variety. The claimed invention in this case is particularly applicable to portable paging devices of the type marketed by both plaintiff Reach and defendant Motorola.

By way of background, radio communications are accomplished by generating a "carrier" wave of radio frequency (thousands or millions of cycles per second), and then "modulating" that carrier wave so that it carries the desired information, which can be a simple tone, a voice, music or even a television picture. Modulation can be accomplished in several different ways, two of the most common being the familiar AM (amplitude modulation) and FM (frequency modulation) systems used in present day radio broadcasting. The modulated carrier wave is then transmitted, or radiated from the antenna of the transmitter, and is ultimately received, or intercepted, by the antenna of a receiver. The receiver processes the modulated carrier wave

**4.** 35 U.S.C. § 102(a), (b), and (g) provides in pertinent part: "A person shall be entitled to a patent unless–

"(a) the invention was known or used by others in this country, or . . . described in a printed publication . . . before the invention thereof by the applicant for patent, or

(b) the invention was . . . described in a printed publication . . . or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or . . . .

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it . . . ."

**5.** 35 U.S.C. § 103 provides in pertinent part: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

**6.** In return for Motorola's Stipulation regarding infringement, plaintiffs stipulated that claims 19 and 20 of the Reissue patent read on a prior Motorola development known as the QRR–11, particularly as described in Motorola's QRR–11 manual. The stipulation reserves to plaintiffs the right to contend that the QRR–11 did not include an "annunciator". Accordingly, the major questions in this case require a determination of whether the QRR-11 work is prior art under 35 U.S.C. §§ 102(a), (b), and (g); whether the QRR-11 included an "annunciator"; and, if not, whether that element is of patentable significance under 35 U.S.C. § 103.

to extract the information and convert it to usable form as, for example, a voice on a loudspeaker or a picture on a TV tube. Consider, for example, the simple case of transmitting a single tone such as middle C. A carrier wave of a given radio frequency, say 1,000,000 cycles per second, is modulated by impressing upon it a signal corresponding to the frequency of middle C. The modulated carrier is then transmitted, and is received by any receiver within range which is tuned to receive carrier waves of 1,000,000 cycles per second. The receiver circuitry then processes the modulated carrier and extracts the middle C tone. The tone might then be used in any of several different ways. It could simply be amplified and fed directly to a loudspeaker, where it would be heard as middle C. Or, it could be used to activate other circuitry which would generate other tones or more complex sounds from the speaker (such as the familiar "beep–beep" emitted by a pager). Or, it could be used to operate a switch, which would cause a lamp to light or a buzzer to sound.

Pagers are small, portable, battery–operated radio receivers designed to be carried on the person of the user, usually in his pocket or clipped to his belt. A typical user might be a doctor or delivery man. The Reissue patent covers improvements in "battery–saver" circuitry for portable communications receivers, such as pagers.

The technique used in paging systems, whereby a transmission intended for a particular receiver will cause a response only in that receiver, is referred to as "selective calling."

The selective calling capability is achieved by assigning to each receiver or pager a unique address code modulated on the carrier wave. Each receiver includes a decoding portion which is designed to respond only to the address code assigned to that receiver. If that particular address code is detected, the receiver is activated. None of the other receivers in the communication system will be activated by the transmission. In other words, a selective–call communication receiver is maintained

non–responsive except in the presence of an address code which is intended for that specific receiver.

The selective–call communication system may be tone only or tone and voice. In the former type, the transmitted intelligence corresponding to the address code for a particular receiver will cause that receiver to be activated and cause its associated lamp to go on or its speaker to produce an audible tone. In a tone–and–voice system, the intelligence is the address code and the ensuing voice message. The address code causes a particular receiver to become activated and produce an audible or visible warning of the ensuing message, the voice message follows.

Because paging receivers are portable, they are battery–operated. There are two types of batteries used in paging receivers: throwaway batteries and rechargeable batteries. Rechargeable batteries are expensive and must be taken out of service about every twelve hours. Throwaway batteries have longer life, but are expensive because they must be replaced often.

In selective–call communication systems, each receiver must be continuously maintained in condition to analyze address codes, so that if a carrier wave modulated by its address code is transmitted, it is activated. Typically, a receiver in such a system is so activated fewer than ten times per day. The average time of activation is very short, so that each receiver is activated for only a small fraction of the day. But, if the receiver circuits are maintained continuously operative, there is a constant drain on the batteries.

A "battery–saving" circuit increases battery life. Generally, battery–saving circuitry operates to turn the receiver alternately on and off during the standby periods when it is waiting to receive a message. Each "off" interval is much longer than each "on" interval, so that during standby the receiver draws current from the battery a small percentage of the time.

The invention of the Reissue patent relates to a selective–call communication receiver including battery–saving circuitry.

More specifically, the battery–saving circuit of the Reissue patent alternately switches the receiver on and off during standby, but will not respond to the presence of just the carrier wave. Rather, the batter–saving circuit will remain in its switching, standby mode until the particular address code for that receiver is received.

The Reissue patent suggests that the processing circuit be on for 15 milliseconds (a millisecond being one one–thousandth of a second) and off for 360 milliseconds. Thus, out of each 375 milliseconds the receiver is fully powered for only 15 milliseconds, or 4 percent of the time.

The communication receiver of claims 19 and 20 is adapted to receive a carrier wave modulated by intelligence including a particular kind of address code, namely "a series of control tones." A series of control tones is a plurality of tones that do not overlap in time. In other words, each tone begins when the preceding tone ends.

The communication receiver of claims 19 and 20 has a "processing circuit" or "receiving circuit." Such processing circuit separates intelligence from the carrier wave.

Power for the "processing circuit" of claims 19 and 20 is supplied by a "pulser circuit" which forms a part of the battery saving circuitry of the invention. The "pulser circuit" operates normally to produce a continual series of spaced–apart pulses of voltage, with the spacing between pulses being much greater than the duration of each pulse.

The output of the "processing circuit" of claims 19 and 20 is fed to a "decoder" which determines whether or not the transmitted signal includes the first tone of the "series of control tones" which comprises the address code for that receiver.

In the particular embodiment discussed above, that first tone lasts 400 milliseconds. Thus, although the "processing circuit" is on for only 15 milliseconds out of every 375 milliseconds, it is certain to detect the first control tone at some time during its 400 millisecond duration.

If the first control tone of the receiver address code is detected during one of the "on" periods, the "decoder" conditions the "pulser circuit" to drop out of its switching mode and to provide a continuous voltage supply to the "processing circuit" in order to maintain it on continuously for a predetermined interval for analyzing a "subsequent tone". If the subsequent tone of the receiver's address code is detected, an output signal is produced to actuate an "electronic switch circuit" which in turn actuates a "utilization circuit" in the form of an oscillator or a lamp control circuit. An "annunciator", such as a loudspeaker or a lamp, converts the signal produced by the "utilization circuit" into an audible or visible alerting signal.

An "electronic switch circuit" is an electrical circuit which has two states, on and off, with no intermediate state, and is adapted to be shifted suddenly from one state to another.

The term "annunciator" in claims 19 and 20 has meaning in the context of the "communication receiver" introduction to the claims. A "communication receiver" requires means for making intelligible to a person information transmitted from another person. The "annunciator" displays the information communicated by the other person. If the annunciator is a lamp, for example, then such other person may cause it to be turned on and in from the person carrying the communication receiver that he is to perform some previously agreed–upon action, such as calling his office.

If, during the continuous "on" interval after the first control tone is received, the next control tone of the address code is not detected, the "pulser circuit" reverts to its pulsing or "standby" mode of operation for intermittently energizing the "processing circuit".

Claim 19 requires that the decoder have the capability of responding to any "subsequent" control tone to generate the second control signal. Claim 20 is more specific, requiring the decoder to respond to the "last" control tone in the series.

Motorola manufactures and sells many different types and models of pages, for use in several types of systems, ranging from quite simple to extremely complex and sophisticated. The particular Motorola pager models which are accused to infringe the Reissue patent are so–called "tone only" pages, in that they do not receive or reproduce voice messages; they simply alert the user by beeping. The PAGEBOY II pagers use a two tone address system: each pager has a unique address consisting of two tones, and a particular pager will respond (beep) only when it receives those two tones, which must be of the proper frequency and in the proper sequence. The METRX and METRO–PAGEBOY pagers use a more complicated address system consisting of a preamble tone and five or six address tones. The sixth tone is used to trigger a dual alert function: for example, if the page receives the preamble tone and its five unique address tones in the proper sequence, it would emit a continuous beep, which might mean "call your office;" if it receives the sixth tone as well, it would respond with an interrupted beep, which might mean "call your home."

The Reissue patent purports to cover improvements in "battery–saver" circuitry for portable communications receivers, such as pagers. Inasmuch as such devices are powered by batteries, battery life is an obvious concern. In the accused Motorola equipment, the battery saver is optional in the PAGEBOY II, standard in the METRO PAGEBOY, and standard in those METRX pagers which do not have the "preambleless" option.

Motorola contends that claims 19 and 20 of the Reissue patent are invalid in view of two separate prior developments. First, it contends that the claims are invalid in view of the so–called QRR–11 receiver, which Motorola developed between 1965 and 1968. Second, Motorola contends that the claims are invalid in view of United States Patent No. 2,912,574 to Gensel. Motorola has also made reference to United States Patents to Morton and Clark, but has not explained the devices disclosed therein. It is undisputed that the Gensel patent is part of the prior art cited in the Reissue patent.

The QRR–11 receiver is a remote control switch for detonating demolition, and was developed by Motorola for the U. S. Government. It has a battery–saving circuit operated by a series of control tones, viz., an "ARM" tone for turning off the batter–saving pulser and holding the receiver on for a continuous period to receive a subsequent "FIRE" tone which closes a switch to actuate associated demolition equipment.

In response to a government request, Motorola submitted a proposal for the development and manufacture of twenty–five systems designated "QRS–11 Systems", each such system including a QRT–11 transmitter, a QRR–11 receiver, and associated peripheral equipment including an antenna, a battery tester, a receiver test fixture, and a manual. On or about June 28, 1965, this proposal was modified and ultimately resulted in a contract dated November 8, 1965. Equipment described in the Motorola manual was ultimately sold to the U. S. government more than one year before the effective filing date of the Reissue patent.

The underlying contract states, under a heading titled "SECURITY", that "the association of the sponsor with the work being produced under this Contract is classified SECRET."

The contract itself, and most of the documentation in evidence relating to it, bear various classification notices. The word "declassified" appearing on these documents was applied subsequent to November 16, 1977, and none of those documents bore the word "declassified" before that date. Many of these documents include a Motorola classification legend.

Whether or not the QRR–11 equipment and manual were technically "classified", Motorola nevertheless treated them as secret, at least because the use of the terms "ARM" and "FIRE" thereon would suggest the identity of the government agency sponsor.

Motorola never disclosed the subject matter of the QRR–11 receivers or the manuals

thereon to anyone other than the U. S. government. The QRR–11 equipment was never sold or offered for sale to anyone other than the U.S. government. No one other than Motorola ever made such equipment for the government, and there is no evidence that Motorola or the government ever disclosed the QRR–11 circuitry to anyone else.

The QRR–11 receiver was tested by the government and Motorola using the receiver test fixture in accordance with test procedures set forth in the manual. Only selected Motorola and government personnel witnessed such tests. Neither Motorola nor the government ever used the QRR–11 receiver for detonating demolition. David Malone, the government program manager for the QRR–11 project, testified that he was in a position to know that the QRR–11 receiver and the manuals therefor were in fact caused to be used by the government. However, he refused, on the grounds of national security, to identify the users, to give the times and places of the uses, or even to state the source of his knowledge with respect to use of the QRR–11 receivers. Additionally, he stated that his knowledge was based on what someone else had told him.

Motorola never used tone–operated battery–saving in commercial communication equipment until late 1971, during its development of its PAGEBOY II pager, after the Reach battery–saving pager of the Reissue patent was on the market.

Subsequent to the marketing of the Reach battery–saving pager, Motorola developed the tone–operated battery–saving circuit used in its own infringing pagers, and caused a patent application to be filed covering that circuit, all in ignorance of the QRR–11 development. In this regard, Messrs. Rennels and Kuznicki, who worked on the battery–saving circuitry in Motorola's infringing PAGEBOY II pager and who were named as co–inventors thereof in the Motorola patent application on that circuitry, were unaware of Motorola's previous battery–saver work in connection with the QRR–11 project.

Motorola and its employees have at all times treated the entire QRR–11 project, including the receiver circuitry and the manual, as secret.

The QRR–11 technology was not known to anyone other than Motorola and the U. S. government, the parties to the classified contract of DX-123.

A skilled artisan, researching the battery–saving art, would have had no way of discovering the existence of the QRR–11 development because of its secrecy.

Motorola contends that there are no differences between claims 19 and 20 of the Reissue patent and the QRR–11 receiver, and that the lamp in the "receiver test fixture" supplied with the QRR–11 receiver constitutes the "annunciator" recited in claims 19 and 20. On the other hand, plaintiffs contend that such lamp is not an annunciator, and that the addition of a receiver test fixture to the QRR–11 receiver does not change it from a remote control switch for detonating demolition.

The QRR–11 receiver is not a communication receiver but is rather a remote control switch for detonating demolition.

Even if the QRR–11 receiver were not secret and, therefore, accessible to the public, one of ordinary skill in the radio communication art would probably not discover it because he would not look to the demolition detonation art for the answer to battery–saving problems in a communication receiver.

Motorola did not call the QRR–11 development to the attention of the Patent Office during the prosecution of its own patent application covering the battery–saving circuitry of its infringing PAGEBOY II pagers.

The term "annunciator" in claims 19 and 20 is used in the context of the "communication-receiver introduction to the claims. A "communication receiver" requires means for making intelligible to a person information transmitted from another person. The "annunciator" displays the information communicated by the other person. The lamp in the receiver test fixture is not an

"annunciator" within this meaning. When the receiver test fixture is used with the QRR–11 receiver, it is used simply to determine whether or not the QRR–11 receiver he is testing is properly operable. It is not used to enable the person testing the receiver to receive intelligence transmitted from another person.

The combination of the QRR–11 receiver with the receiver test fixture attached thereto could not be used as a selective–calling pager since all QRR–11 receivers made used the same "ARM" and "FIRE" tones. Therefore, a transmission directed to one receiver would activate all receivers on the channel.

The QRR–11, with or without the receiver test fixture attached thereto, has no annunciator.

The Gensel patent was considered by the Patent Office during the prosecution of both the Original patent and the Reissue patent. The Gensel patent is a so–called "paper patent", i. e., the circuitry disclosed therein has not been incorporated in a commercial device.

The Gensel patent discloses a paging–type radio receiver including a battery–saving circuit which is tone–operated. The Gensel receiver includes pulsing circuitry for intermittently turning the receiver on and off. The receiver is designed to be responsive to three simultaneous tones, one of which is labeled a "control signal" and the other two of which are labeled a "calling signal." If the "control signal" is received by the receiver during one of its "on" periods, the pulsing circuitry provides continuous power to the receiver for maintaining it continuously on as long as that tone is present. If the tones of the "calling signal" are simultaneously received, an alarm is actuated.

Claim 19 recites a circuit which is responsive to a "series" of control tones, i. e., tones which do not overlap in time. The Gensel patent discloses a receiver which is responsive to a set of three simultaneous tones. While the Gensel disclosure indicates that the three tones may begin at different times, it is clear that there must be some

time when all three tones are present simultaneously in order for the receiver to operate as intended. Nowhere does Gensel disclose or suggest that his receiver is intended for, or capable of, operation in response to a series of tones.

This interpretation of the Gensel patent was submitted to and accepted by the Patent Office during the prosecution of the Original patent.

There are several structural differences between the Gensel patent and the invention recited in claims 19 and 20, which afford significant operational advantages of the claimed invention over the device of the Gensel patent. Thus, the fact that the communication receiver of claim 19 is responsive to a "series" of control tones permits the use of very fast filters in the decoder which can respond in several milliseconds rather than the several hundred milliseconds required by the Gensel vibrating reeds. This permits rapid detection of the control tones, which increases overall signaling speed of the system and greatly enhances the freedom from falsing, i. e., response to spurious signals. Because the likelihood of falsing is much greater with Gensel's simultaneous tones than with a series of tones, the Gensel arrangement requires that the tones be present for a relatively long period of time in order to prevent excessive falsing. Because the Wycoff series–tone arrangement permits the use of rapidly responding circuitry, the "on" time of the battery–saving pulser can be very short, thereby permitting the "off" time to also be relatively short and still maintain high battery saving ratios. The fact that the total of the "on" and "off" times of the pulser cycle can be relatively short results in significantly increased speed of signaling, thereby allowing more pagers to be on the channel. Furthermore, by the use of a series of control tones, unlimited code capacity is permitted.

The "electronic switch circuit" of claim 19 permits the provision of a timing function or a latch function. This is not possible with the gradually responding arrangement of the transistor 37 and associated reed

switches used by Gensel. Furthermore, in the Gensel arrangement, the output signal may vary in intensity with the input signal, resulting in the inherent disadvantage that when the signal received from the transmitter is weak or noisy the reception might be erratic and/or the audio output from the receiver might be intermittent. Such possibilities are avoided with the electronic switch circuit of the claimed invention of Wycoff.

Other references relied on by Motorola are simply not applicable in this case.

Plaintiffs' and defendant's expert witnesses expressed diametrically opposite opinions regarding the novelty and unobviousness of claims 19 and 20 in view of the QRR–11 and the Gensel patent. But what would be obvious to experts such as these, with the hindsight benefit of knowledge of the disclosure of the Wycoff Reissue patent, would not necessarily be obvious to one of ordinary skill in the art who did not have the benefit of the Wycoff disclosure. In any event, in attempting to resolve the conflicting testimony of the experts, independent objective evidence bearing on the novelty and unobviousness of the Wycoff invention and the pertinence of the prior art thereto has particular significance.

At the time of the invention by Mr. Wycoff of the battery–saving communication receiver of claims 19 and 20, the industry had for some time been in need of such a receiver. Up to that time no one had successfully used battery saving in commercial pagers.

In the prior paging receivers with throwaway batteries without battery saving, attempts had been made to increase battery life by designing the receiver circuitry so as to place minimum drain on the batteries. Some success had been achieved by these efforts. Thus, the Reach pagers without battery saving had a battery life of about 400 hours and pagers made by Bogen had achieved battery life of 600 to 800 hours. But most pagers without battery saving had battery lives in the range of between 40 and 150 hours.

The invention of claims 19 and 20 overcame these disadvantages by utilizing a battery–saving circuit operated by a series of control tones. As a result, the Reach pager employing the battery–saving circuit of the Reissue patent achieved a battery life of more than 10,000 hours. This increase from 400 hours to 10,000 hours in the battery life of the Reach pagers was due to the battery–saving circuit of the Reissue patent.

When the Reach two–tone paging receiver with battery saving, as claimed in claims 19 and 20, was first marketed by Reach in 1970 (fiscal 1971), it became an almost instant success. From fiscal 1968 to fiscal 1971, the sale of Reach's two–tone paging receivers without battery saving increased substantially from 41 units in 1968 to 1130 units in 1971. The two–tone paging receiver with battery saving was introduced in mid–1971, and during the remainder of that fiscal year 172 units were sold. The following year the new battery–saving receivers dominated Reach's sales, with 1,069 units being sold, while the sales of non–battery saving receivers dropped from 1130 units in 1971 to 318 units in 1972. From 1972 through 1975 sales of the battery–saving receivers rose dramatically to 4,212 units, dipped slightly in 1976–1977, and then continued to rise, with 4,631 units being sold in 1979. Meanwhile, the sales of non–battery saving units increased slightly in 1973 and then continued a steady decline, with only 72 units being sold in 1979. This dramatic success of the Reach pagers with battery saving was despite the fact that they were priced at $18.00 or $19.00 higher than the pagers without battery saving, until 1978. At that time, Reach began offering the battery saving circuit as a standard feature in its two-tone pagers, and would remove the battery saving circuit as an option upon request.

There is no evidence that the commercial success of Reach's two-tone battery–saving pages is due to anything other than the battery saving circuit of the Reissue patent.

The fact that the plaintiffs' patented invention was a significant breakthrough in

the selective–call paging receiver art is attested to by the comments of plaintiffs' competitors, including Motorola. In addition, the tribute paid to Reach by its licensees is significant. Licensees under the patent in suit have paid royalties exceeding $240,000 during the past four years.

In May, 1972, a patent application, assigned to Motorola, was filed in the names of Messrs. Rennels and Kuznicki, covering their development of a battery–saving circuit for a paging receiver. The battery saving circuitry disclosed in that Motorola application is identical to the battery–saving circuitry of the admittedly infringing PAGEBOY II pager. The mere fact that the defendant pursued such a patent application, and did so in the face of the Gensel patent and without citing its own QRR–11 receiver, each of which it now contends anticipates the claims of the patent in suit, undermines significantly, if not completely, the defendant's contention that the patent in suit is obvious in view of that Gensel patent or the QRR–11 receiver and other less pertinent prior art.

### CONCLUSIONS OF LAW [7]

This court has jurisdiction of this action under, 28 U.S.C. § 1338. Motorola does not contest personal jurisdiction and venue is proper in this district under 28 U.S.C. § 1400(b).

First, this court concludes that Motorola's QRR–11 development cannot be considered as prior art in order to invalidate plaintiffs' patent under 35 U.S.C. §§ 102(a), (b), and (g). We consider each of these sections separately. See, *Piet v. U. S.*, 176 F.Supp. 576 (D.C.Cal.1959), modified in other grounds 9 Cir., 283 F.2d 693.

Section 102(a) provides that a person shall not be entitled to a patent if "the invention was known or used by others in this country, or ... described in a printed publication ... before the invention therefor by the applicant for patent...."

The knowledge or use required in this section to invalidate a patent because of lack of inventorship is public knowledge (see, *Application of Hilmer*, 359 F.2d 859 (Cust. & Pat.App.1966)), of a complete and operative device. See, *Johnson & Johnson v. W. L. Gore & Assoc., Inc.*, 436 F.Supp. 704, 710 fn. 6 (D.C.Del.1977); *Jones Knitting Corp. v. Morgan*, 361 F.2d 451 (3d Cir. 1966); *Connecticut Valley Enterprises, Inc. v. U. S.*, 348 F.2d 949, 172 Ct.Cl. 468 (1965). The record here discloses neither that the alleged QRR–11 disclosure to the U. S. government made the invention publicly known nor that any one, including defendant Motorola, attempted to put the QRR–11 invention into practice at anytime prior to Wycoff's conception.

Moreover, any contention to the contrary advanced by Motorola is seriously undermined by the fact that Motorola, in a subsequent patent application for battery–saving circuitry, failed to even mention the QRR–11 conception.

Accordingly, it is clear to this court that plaintiffs' claimed invention cannot be invalidated under 35 U.S.C. § 102(a) as the evidence did not disclose that the invention was known or used by others before the plaintiffs' invention. See also, *Minneapolis–Honeywell Regulator Co. v. Midwestern Instruments, Inc.*, 298 F.2d 36, 38 (7th Cir. 1962); *Cargoline Co. v. Mobil Oil Corp.*, 301 F.Supp. 141, 147–8 (N.D.Ill.1969); *Technitrol, Inc. v. Aladdin Industries, Inc.*, 316 F.Supp. 639, 644 (N.D.Ill.1970).

Additionally, the evidence does not support the application of the "described in a printed publication" language contained in both 35 U.S.C. §§ 102(a) and (b), nor the application of the "in public use or on sale" within the United States language employed in 102(b).

While the Motorola manual containing a description of the QRR–11 conception was sold to the government approximately one year before the effective filing date of

---

**7.** Any conclusion of law which may be more properly termed a finding of fact shall be deemed a finding of fact.

the Reissue patent, this publication did not, as is required, place the claimed subject matter in the possession of the public, since the publication remained secret within the U.S. government's hands only. See, *Application of Samour, Cust. & Pat. App.*, 571 F.2d 559 (Cust. & Pat.App.1978).

Any distribution of the QRR–11 manuals which might have occurred was so shrouded in secrecy that Mr. Malone was constrained, on the grounds of national security, to disclose no information whatsoever concerning such distribution. It is manifest that any such limited and secret dissemination did not make the QRR–11 manual available to the general public.

The defendant contends that the mere fact that the QRR–11 manual was available to certain Motorola and U.S. government personnel constitutes a "publication" thereof within the meaning of §§ 102(a) and (b). But the law is otherwise. The decided cases clearly indicate that distribution of printed documents by an independent contractor to the customer or contracting party in connection with the contract work does not, in and of itself, constitute a "publication" of the documents. *Dow Chemical Co. v. Williams Bros. Well Treating Corp.*, 81 F.2d 495, 499 (10th Cir.), *cert. denied*, 298 U.S. 690, 56 S.Ct. 960, 80 L.Ed. 1408 (1936).

In *University of Illinois Foundation v. Blonder–Tongue Laboratories, Inc.*, 422 F.2d 769, 772 (7th Cir. 1970), *cert. denied*, 409 U.S. 1061, 93 S.Ct. 559, 34 L.Ed.2d 513 (1972), the patentee had been engaged with his assignee in the performance of an Air Force contract, pursuant to which reports were prepared and distributed from time to time to persons on an Air Force distribution list. The Court held that neither the assignee's possession of the reports nor the distribution to the people on the Air Force list constituted a "publication" of the documents. See also *Layne–New York Co. v. Allied Asphalt Co.*, 363 F.Supp. 299, 307 (W.D.Pa.1973), rev'd on other grounds, 501 F.2d 405 (3rd Cir. 1974), *cert. denied*, 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975).

█ The QRR–11 receiver was not "on sale" within the meaning of 35 U.S.C. § 102(b) since the "on sale" event must either be on behalf of the patentee (Wycoff) so as to constitute a competitive exploitation of his invention, or must be under circumstances such as to make the invention available to the general public. Neither situation exists in this case. *Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 518 (2nd Cir.), *cert. denied*, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946); *Stamicarbon, N.V. v. Escambia Chemical Corp.*, 300 F.Supp. 1209, 1217 (N.D.Fla.1969), modified on other grounds, 430 F.2d 920 (5th Cir.), *cert. denied*, 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970).

In a case factually similar to the case at bar, Judge Robson held that sales by a third party do not constitute an on–sale bar to a patent under § 102(b) if the sales are secret and do not operate to disclose the patented invention to the general public. *Technitrol, Inc. v. Aladdin Industries, Inc.*, 316 F.Supp. 639 (N.D.Ill.1970). In that case, plaintiff sued for infringement of its patent on a transformer casing. A third party had previously developed specifications for such a casing, had casings manufactured according to the specifications, and then assembled transformers with the casings. The casings were not classified and the assembly of the transformers therewith was not restricted aside from usual plant security. But the basings and transformers therein were sold under a single restricted contract for use in a classified aircraft produced for the U.S. government in a restricted project. No transformers were ever sold or offered for sale to the general public. The District Court held that the restricted sale and secret use of this prior casing did not constitute a bar to the patent in suit under 35 U.S.C. § 102(b).

Motorola's sale to the government cannot constitute a bar under Section 102(b) since the QRR–11 receiver was sold to the government under a restricted contract for uses which are so secret that we have not been permitted to learn anything about them even at trial.

■ The QRR–11 development is not available under 35 U.S.C. § 102(g) since it was suppressed and concealed from the general public, having been developed under a classified government contract, *Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc.*, 188 F.Supp. 248, 252 (N.D.Ill.1960), aff'd., 298 F.2d 36 (7th Cir. 1962); *Technitrol, Inc. v. Aladdin Industries, Inc.*, 316 F.Supp. 639, 644 (N.D.Ill. 1970), and, in any event, having been secreted by Motorola from all except the U.S. government, including Motorola's own commercial paging department. *International Glass Co. v. United States*, 187 Ct.Cl. 376, 408 F.2d 395, 403 (1968); *Farmhand, Inc. v. Lahman Mfg. Co.*, 192 U.S.P.Q. 749, 756–7 (D.S.D.1978), aff'd., 568 F.2d 112 (8th Cir.), *cert.* denied, 197 U.S.P.Q. 848 (1978).

The Reissue patent is presumed to be valid (35 U.S.C. § 282), and this presumption is strengthened by reason of the fact the Gensel patent, the most pertinent prior art, was considered by the Patent Office during the prosecution of the applications for the Original and Reissue Patents. *Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866, 871 (7th Cir.), *cert.* denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974); *Skil Corp. v. Cutler–Hammer, Inc.*, 412 F.2d 821, 824 (7th Cir.), *cert.* denied, 396 U.S. 951, 90 S.Ct. 394, 24 L.Ed.2d 257 (1969).

■ The burden of proof in overcoming this presumption rests heavily on the defendant. *Mumm v. Jacob E. Decker & Sons*, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937); *Reynolds Metals Co. v. Aluminum Co. of America*, 457 F.Supp. 482, 505 (N.D.Ill.1978), rev'd on other grounds, 609 F.2d 1218 (7th Cir. 1979) U.S. cert. pending; *Malsbary Mfg. Co. v. Ald, Inc.*, 447 F.2d 809, 813 (7th Cir. 1971).

The defendant has asserted two references as anticipating, under § 102, claims 19 and 20 of the Reissue patent: the QRR–11 receiver (and manual thereon) and the Gensel patent.

■ The defense of anticipation. is strictly a technical one, and unless *all* of the elements are disclosed in a particular reference, that reference does not anticipate. *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1182–3 (7th Cir. 1971), cert. dismissed, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971). There are important differences between the references and the claims in issue. Therefore, the references cannot be anticipating prior art under § 102.

The Seventh Circuit recently reiterated its standard on the anticipation issue in *Reynolds Metals Co. v. Aluminum Co. of America*, 609 F.2d 1218, 1220 (7th Cir. 1979):

The issue of anticipation by prior art is not determined by insubstantial distinctions between a purported invention and prior art. A purported invention is anticipated by prior art "if the general aspects are the same and the differences in minor matters is only such as would suggest itself to one of the ordinary skill in the art." *Popeil Bros., Ins. v. Schick Electric, Inc.*, 494 F.2d 162, 165 (7th Cir. 1975).

Claims 19 and 20 are not anticipated by the Gensel patent, since there are clear structural and functional differences between the claimed invention and the Gensel disclosure.

Claims 19 and 20 of the Reissue patent call for a "series" of control tones, and circuitry responsive to the first tone to produce a "first control signal" and responsive to "a subsequent tone" to produce a "second control signal." On the other hand, the Gensel patent deals with a receiver responsive to a set of *three or more simultaneous* tones. Indeed, the fact that the Gensel system demands simultaneous tones was urged before and accepted by the Patent Office during the prosecution of the application for the Original patent.

Furthermore, the Gensel patent does not disclose "an electronic switch circuit" as called for by the claims in suit and, in particular, the Gensel transistor 37 is not an electronic switch circuit, as urged by Motorola.

Finally, the Gensel patent does not provide "a second output" on which "a second control signal" appears to operate the elec-

tronic switch circuit to cause it to provide an enabling signal, as required by claim 19.

The Gensel patent does not anticipate claims 19 and 20 of the Reissue patent.

Assuming, *arguendo*, that Motorola's QRR–11 development were available as prior art, it differs structurally and functionally from the subject matter of claims 19 and 20 and thus could not anticipate those claims under 35 U.S.C. § 102. *Copease Mfg. Co. v. American Photocopy Equipment Co.*, 298 F.2d 772, 778–9 (7th Cir. 1961); *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1182–3 (7th Cir.), cert. dismissed, 403 U.S. 942, 91 S.Ct. 2270, 29 L.Ed.2d 722 (1971).

Claims 19 and 20 of the Reissue patent require an "annunciator" for converting the output signal into usable form. The QRR–11 equipment has no annunciator. Modhler admitted that the parts list for the receiver, which appears in Table 5–1 of the QRR–11 manual, does not include an annunciator. He further admitted that the detailed schematic circuit disclosed in Figures 6–1 and 6–2 of the QRR–11 manual does not disclose an annunciator.

Defendant argues that the lamp in the receiver test fixture supplied with the QRR–11 receiver is such an annunciator. However, even if that were so, the test fixture is not part of the QRR–11 receiver *per se*, nor was it to be used when the receiver was operated for its intended purpose of detonating demolition.

Furthermore, the term "annunciator" in the Reissue claims has meaning in the context of the "communication receiver" introduction to the claims. A "communication receiver" requires means for making intelligible transmission of information from one person to another person. The "annunciator" is the means by which the communicated information is represented to the other person. If the annunciator is a buzzer, for example, then such other person may cause it to be sounded and thereby inform the person carrying the communication receiver that he is to perform some previously agreed upon action, like calling his office.

The lamp in the receiver test fixture on the QRR–11 performs no such function. It tells the person operating the transmitter that the receiver he is testing works. It is not part of a system to communicate information from someone else. Since the receiver test fixture is not related to the QRR–11 receiver "in exactly the same situation and united in the same way to perform an identical function" to the annunciator of the Reissue patent, there is no anticipation. *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc., supra*, 436 F.2d at 1182–3.

Motorola also contends that claims 19 and 20 of the Reissue patent are invalid under 35 U.S.C. § 103 as being obvious in view of the Gensel patent or the QRR–11 manual, taken singly, or in view of each other and the Morton and Clark patents. However, this court concludes that the subject matter of claims 19 and 20 would not have been obvious to one of ordinary skill in the art at the time of the invention thereof in view of the Gensel patent or the QRR–11 development (assuming it is available as prior art), taken either singly or in view of the Morton and Clark patents. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966).

In determining the issue of unobviousness under Section 103, the court must address itself initially to certain factual inquiries, which were delineated by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–694, 15 L.Ed.2d 545 (1966) as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

By reason of the presumption of validity of the patent in suit, the defendant has the burden of providing the obviousness of the patented invention in view of the prior art. *Malsbary Mfg. Co. v. Ald, Inc.*, 447 F.2d 809, 813 (7th Cir. 1971). Specifi-

cally, the presumption of validity places on defendant the "responsibility to present evidence to the court to enable it to make the determinations recited in *Graham v. John Deere, supra*". *Saginaw Products Corp. v. Eastern Airlines, Inc.*, 195 U.S.P.Q. 551, 555 (E.D.Mich.1977).

However, the QRR–11 receiver and the manual thereon are not available as prior art, as discussed above. In other words, because of its secrecy the QRR–11 development could not have been discovered by a person of ordinary skill in the paging art at the time of the invention of the patent in suit. Thus, it follows *a fortiori* that such a person cannot be presumed to have had knowledge of that work.

Furthermore, even assuming that the QRR–11 receiver were available as prior art, it is a demolition detonation switch, and is not analogous to a communication receiver. Mr. Wycoff said he would not have looked to the demolition detonation art to solve a battery–saving problem in pagers, but rather would have looked to the communication receiver and selective calling system arts. Messrs. Rennels and Kuznicki, when they devised the battery–saving paging receiver disclosed in Motorola's patent application, did not look to the demolition detonation art for an answer to the battery life problem, even though their own company had done the QRR–11 work in that area in another department.

Plaintiffs do not dispute that the patents to Gensel, Clark, and Morton are part of the prior art which may be considered in evaluating the validity of claims 19 and 20 of the Reissue patent.

Briefly, the references fail to disclose the following essential features of the claims in suit:

(a) The QRR–11 receiver does not have an "annunciator";

(b) The receiver in the Gensel patent is not responsive to a series of tones, and does not have a second output on which a second control signal appears, and the Gensel receiver does not have an electronic switch circuit;

(c) The receiver in the Clark patent does not even have battery–saving circuitry;

(d) The Morton patent discloses a receiver responsive to simultaneous tones only.

The Supreme Court in *Graham v. John Deere Co., supra*, described no clear method for the determination of the "level of ordinary skill" in the art in question. We have no doubt that the level of ordinary skill is certainly less than the level of skill exhibited by experts such as Messrs. Wycoff and Davis.

It must be remembered that the burden is on the defendant to prove the obviousness of the claims in suit in view of the prior art, i. e., defendant must present sufficient evidence to enable the court to make the factual determinations required in *Graham v. John Deere, supra*. *Saginaw Products Corp. v. Eastern Airlines, Inc.*, 195 U.S.P.Q. 551, 555 (E.D.Mich.1977). And, in the instant case, there was no direct testimony as to what constitutes the level of ordinary skill in the art relevant to the subject matter of the Reissue patent. However, we can glean some sense of the level of ordinary skill from the direction of the solutions attempted by the prior art, to the extent that defendant has cited prior art references. The earliest references are the Gensel patent which issued in 1959, and shows that, as of that date, the art had been taught the concept of a selective–call paging receiver incorporating battery–saving circuitry actuated by a plurality of simultaneous tones. The Morton patent, the application for which was filed in 1963, did not advance significantly beyond the Gensel teaching, since Morton simply disclosed a selective–call radio receiver having a battery–saving circuit responsive to a single tone or a combination of simultaneous tones.

Finally, the Clark, Jr. patent, issued in 1969, does show a selective call receiver wherein the selectivity is achieved by two sequential tones. But Clark includes no battery–saving circuitry.

In other words, in the nine years from the issuance of the Gensel patent to the filing of the Wycoff application, none of the

prior art patentees had come up with the concept of a sequential–tone–operated battery–saving circuit in a selective–call communication receiver. Significantly, the direction taken by those skilled in the art in attempting to solve the battery–saving problem was to continue to attempt to devise an effective battery–saving circuit operated by a single tone or carrier wave, or by a group of simultaneous tones.

Thus, the evidence shows that, by the time of Wycoff's invention, there had been no movement by those skilled in the art in the direction of the solution which Wycoff conceived.

Each of the prior art references cited by defendant, and available for consideration under § 103, is significantly different from the invention recited in claims 19 and 20; and, despite the fact that the most pertinent of those references, the Gensel patent, had been available since nearly ten years before the Wycoff invention, none of the intervening references moved in the direction of the Wycoff invention.

■■ With respect to the Gensel patent, it is a "paper" patent which has never been commercialized and, therefore, it must be strictly construed and is entitled to little weight on the issue of non–obviousness. *Columbia Broadcasting System, Inc. v. Zenith Radio Corp.*, 391 F.Supp. 780, 788 (N.D. Ill.1975), mod. on other grounds, 537 F.2d 896 (7th Cir. 1976); *Harris–Hub Co. v. Lear Siegler, Inc.*, 179 U.S.P.Q. 469, 475 (N.D.Ill. 1973).

The expert opinion of Messrs. Wycoff and Davis are in direct conflict regarding the unobviousness of the Wycoff invention. But the issue can be resolved by looking to other independent, objective evidence.

The Davis opinion testimony regarding obviousness of claims 19 and 20 in view of Gensel is belied by the fact that Motorola later pursued its own application covering subject matter closely related to that of the invention of the patent in suit, despite the fact that the Gensel patent was cited to the Patent Office against that Motorola application. Also, it is undisputed that the Patent Office considered the Gensel patent twice, one during the prosecution of the Original patent and again during the prosecution of the Reissue patent. In both cases, the Patent Office considered the Gensel patent not to be a bar to a patent for Mr. Wycoff's invention. The evidence, then, is compelling that the invention of the patent in suit is not obvious in view of the Gensel patent.

Finally, it is significant to note that Mr. Brilliant of Multitone, a man of ordinary skill in the art, not only did not find the Wycoff battery–saving invention obvious, but even four years after its introduction to the market he still refused to believe that it could operate as advertised.

In addition to the criteria discussed above for determining unobviousness, the Court in *Graham v. John Deere Co., supra,* directed attention to such additional considerations as commercial success, long–felt but unsolved needs, and failure of others, and held that "As indicia of obviousness or nonobviousness, there inquiries may have relevancy."

In the instant case, the unobviousness of claims 19 and 20 is further evidenced by the facts that:

(a) The Wycoff invention was the solution to a long–felt need in the industry. *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.*, 534 F.2d 89 (7th Cir. 1976); *Ekco Products Co. v. Chicago Metallic Co.*, 321 F.2d 550, 553 (7th Cir. 1963), *cert. denied*, 375 U.S. 970 [84 S.Ct. 490, 11 L.Ed.2d 418] (1964).

(b) The Wycoff invention of claims 19 and 20 has met with great commercial success. *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp., supra; Continental Can Co. v. Anchor Hocking Glass Corp.*, 255 F.Supp. 67, 76 (N.D.Ill. 1965), mod., 362 F.2d 123 (7th Cir. 1966).

(c) The Wycoff invention of claims 19 and 20 has received the unsolicited tribute of competitors. *Nuclear–Chicago Corp. v. Nuclear Data, Inc.*, 173 U.S.P.Q. 326, 336–7 (N.D.Ill.), rev'd on other grounds, 465 F.2d 428 (7th Cir. 1972); *Free Standing Stuffer, Inc. v. Holly De-*

velopment Co., 187 U.S.P.Q. 323, 334–5 (N.D.Ill.1974).

(d) The patented invention has received the tribute of several licensees. *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp., supra,* 534 F.2d at 93; *Free Standing Stuffer, Inc. v. Holly Development Co., supra,* 187 U.S.P.Q. at 335.

Motorola has tacitly admitted the unobviousness of the invention of claims 19 and 20 by filing its own patent application on a similar battery–saving circuit which infringes claims 19 and 20. *McKee Door Co. v. Forest Door Co.,* 284 F.2d 809, 814 (7th Cir. 1960).

Finally, this court concludes that the record is devoid of any evidence that plaintiffs have withheld any information from the Patent Office during the prosecution of the Original and Reissue patents; have mislead the Patent Office in filing the Reissue application; or has misused its patents in filing this lawsuit.

Motorola first questions why the British Morton and Webster patents were not called to the attention of the Patent Office during the prosecution of the Original patent. This is not a case where prior art was not disclosed to the Patent Office. Indeed, such disclosure was the very purpose of the Reissue application. The only question is whether plaintiffs should have or could have called the British references to the attention of the Patent Office before the Original patent issued.

The answer to this question is that plaintiffs could not have disclosed the British references before the issuance of the Original patent, because neither plaintiffs nor their attorneys in the United States learned of the references until long after that date.

The defendant contends that plaintiffs were chargeable with the knowledge of the Ladas firm (engaged by plaintiffs' attorneys in the United States to prosecute foreign applications) as of December, 1971, when the Ladas firm received the British Official Action. It is clear that only actual knowledge of an attorney or agent can be imputable to the client or principal. *Gamble v. Cornell Oil Co.,* 154 F.Supp. 581, 587–8 (W.D.Okl.1957), aff'd., 260 F.2d 860 (10th Cir. 1958); *Stern v. Lucy Webb Hayes National Training School for Deaconesses and Missionaries,* 381 F.Supp. 1003, 1017 (D.C.D.C.1974). Since it is uncontroverted that no one at the Ladas firm had any actual knowledge of the contents of the British Official Action or the references cited therein until November, 1972, such knowledge could not be attributable to the Prangley firm and, therefore, to plaintiffs prior to that date.

The defendant contends that the delay of only six months from the time plaintiffs gained actual knowledge of the British references (December, 1972) and the time they filed the Reissue application to call those references to the attention of the Patent Office (June, 1973) is unreasonably long and, presumably, inequitable. This court disagrees.

Furthermore, it is clear that upon learning of the British Official Action and the references cited therein in November, 1972, the plaintiffs' first order of business was to place the British application in condition for acceptance by the acceptance date of March, 1973. As soon as that was accomplished, the plaintiffs and the Prangley firm immediately began consideration of the effect of the British references on the Original patent in the U. S. and, a little over three months later, filed the Reissue application.

Furthermore, it is axiomatic that mere delay is insufficient to establish laches. There must be a showing that Motorola has relied on the delay to its detriment. *U. S. Industries, Inc. v. Norton Co.,* 184 U.S. P.Q. 187, 188 (N.D.N.Y.1974). Defendant has not offered the slightest suggestion as to how this allegedly unreasonable delay in filing the Reissue application could possibly have prejudiced the defendant or anyone else. Defendant has offered no evidence of any wrongfulness, willfulness, or bad faith on the part of plaintiffs or their attorneys in connection with the timing of the Reissue application. Absent such evidence, a de-

fense of fraud or inequitable conduct cannot be sustained.

The defendant also asserts that Wycoff misled the Patent Office, as to the time of discovery of the British references, by stating in the Reissue oath of June 1, 1973, that they had been "only recently discovered." The British references had been cited to Wycoff six months prior to signing the oath. That certainly is recent, particularly in the context discussed above.

Furthermore, the defendant offered no evidence that the Patent Office was in any way misled by Wycoff's Reissue oath, nor has any reason been advanced as to why the Patent Office would have been at all interested in the exact date on which Wycoff learned of the British references, since it was evident that they were discovered well after the issuance of the Original patent and that the Reissue application was filed well within two years of the issuance of the Reissue patent.

When this suit was filed, the Reissue patent had not yet issued and, therefore, the suit was based upon a charge of infringement of the Original patent. But, the defendant contends that, since the plaintiffs knew that at least one of the claims of the Original patent was invalid in view of the British references (indeed, plaintiffs had filed the Reissue application to remedy that very situation), they should have either disclaimed the invalid claims in the Original patent before bringing suit, or should have specifically excluded the invalid claims from their allegations of infringement.

■ First of all, it is well‚settled that failure to disclaim an invalid claim before bringing an infringement suit affects only the plaintiffs' right to recover costs. Disclaimer of the invalid claim is not a prerequisite to suit, unless the invalid claim is invalid by reason of deceptive intent. *CPC International, Inc. v. Standard Brands, Inc.*, 385 F.Supp. 1057, 1062 (D.Del. 1974); see also *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.*, 452 F.2d 579, 595 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

The Reissue patent was substituted in the litigation as soon as it had issued, and a Certificate of Correction had been received. Defendant has offered no evidence of any fraudulent or deceptive intent on plaintiffs' part in this regard. With respect to the Canadian disclaimer, it is clear that it followed the filing of the Reissue application and did not precipitate it.

Accordingly, it is hereby ordered that judgment be entered in favor of plaintiffs, Keith H. Wycoff and Reach Electronics, Inc.